# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

EDWARD W. REYNOLDS, et al.,

                    **Plaintiffs,**

-vs-

GREG TALBERG, et al.,

                    **Defendants.**
                           /

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS, AND PROOF OF SERVICE**

Case No.: 1:18-cv-00069-PLM-PLG

HON. PAUL L. MALONEY

---

David A. Kallman        **(P34200)**
Stephen P. Kallman     **(P75622)**
Erin E. Mersino         **(P70886)**
**GREAT LAKES JUSTICE CENTER**
Attorneys for Plaintiffs
5600 W. Mount Hope Hwy.
Lansing, MI  48917
(517) 322-3207

---

Timothy J. Mullins      **(P28021)**
Kenneth B. Chapie     **(P66148)**
**GIARMARCO, MULLINS & HORTON, P.C.**
Attorneys for Defendants
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084
(248) 457-7020

---

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

### ORAL ARGUMENT REQUESTED

GREAT LAKES JUSTICE CENTER

## TABLE OF CONTENTS

INDEX OF AUTHORITIES........................................................................................ iii

CONCISE STATEMENT IN SUPPORT OF PLAINTIFFS' POSITION ................................. vi

STATEMENT OF FACTS ......................................................................................... 1

STANDARD OF REVIEW ........................................................................................ 1

ARGUMENT ........................................................................................................ 2

    I.   PLAINTIFFS HAVE STANDING........................................................................ 2

       A.   The Federal Claims. ............................................................................. 2

       B.   The State Claims. ................................................................................ 6

    II.   PLAINTIFFS HAVE PROPERLY PLED VIOLATIONS OF THE LAW........................ 7

       A.   Count I – Defendants Acted Without Legal Authority................................. 7

       B.   Count II – The School District Violated the Matt Epling Safe School Law............... 12

       C.   Count III – Parent's Fundamental Constitutional Rights............................. 12

       D.   Count IV – Right to Privacy, Personal Autonomy, and Personal Identity. ............... 14

       E.   Counts V and VI – Freedom of Speech and Free Exercise of Religion. .................. 16

       F.   Count VII – Michigan Constitutional Violations....................................... 17

       G.   Count VIII – Title IX Violation. ............................................................ 17

       H.   Count IX – Constitutional Vagueness Violations........................................ 18

       I.   Count X – Elliott-Larsen Civil Rights Act Violation (ELCRA)............................ 20

    III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ....................... 24

CONCLUSION..................................................................................................... 25

GREAT LAKES JUSTICE CENTER

## <u>INDEX OF AUTHORITIES</u>

CASES:

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) . . . . 2

*Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315 (1984) . . . . 4

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) . . . . 16, 17

*Bell A. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) . . . . 1

*Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154 (1997) . . . . 2

*Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407 (1942) . . . . 3

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) . . . . 25

*Department of Civil Rights ex rel Forton v. Waterford Tp Dept of Parks and Recreation*, 425 Mich. 173 (1986) . . . . . . . . . 23

*Doe v. Bolton*, 410 U.S. 179 (1973) . . . . . . 3

*Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768 (D.C. Cir. 1982) . 6

*Hall v. Tollett*, 128 F.3d 418 (6th Cir. 1997) . . . . . 25

*Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir. 1985) . . . 4, 5

*Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046 (1987) . . . . . . 17

*Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265 (6th Cir. 1994) . 18

*Hydrick v. Hunter*, 669 F.3d 937 (9th Cir. 2012) . . . . . 25

*J.F. Cavanaugh & Co. v. City of Detroit*, 126 Mich. App. 627, 337 N.W.2d 605 (1983) 7

*Kassab v. Michigan Basic Property Ins Ass'n*, 441 Mich. 433 (1992) . . 22

*Kolender v. Lawson*, 461 U.S. 352 (1983) . . . . . 19

*Lansing Schools Educ. Ass'n v. Lansing Bd. of Educ.*, 487 Mich. 349 792 N.W.2d 686 (2010) . . . . . 7

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130 (1992) . . 3

GREAT LAKES JUSTICE CENTER

GREAT LAKES JUSTICE CENTER

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noises, Inc.,*
501 U.S. 252 (1991) . . . . . . . . . 3

*Miller v. CA Muer Corp*, 420 Mich. 355 (1985) . . . . . 23

*Myers v. Richland County*, 429 F.3d 740 (8th Cir. 2005) . . . . 6

*Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272 (6th Cir. 1997) . . . 3

*Obergefell v. Hodges*, 135 S.Ct. 2584 (2015). . . . . . 14-16

*O'Donnell v. Brown*, 335 F.Supp.2d 787 (W.D. Mich. 2004) . . . 24

*Pearson v. Callahan*, 555 U.S. 223 (2009) . . . . . . 24

*People v. Llewellyn*, 401 Mich. 314, 257 N.W.2d 902 (1977) . . . 8-12

*Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390 (6th Cir. 1987) . 3

*Rice v. President & Fellows of Harvard College*, 663 F.2d 336 (1st Cir. 1981) . 6

*Saucier v. Katz,* 533 U.S. 194 (2001) . . . . . . . 24

*Scalise v. Boy Scouts of America*, 265 Mich. App. 1 (2005) . . . 22

*Sierra Club v. Morton*, 405 U.S. 727, 95 S.Ct. 1361 (1972) . . . 4

*Sykes v. United States*, 507 Fed. Appx. 455 (6th Cir. 2012) . . . 1

*Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054 (2000) . . . 13, 14

*United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405 (1973) . . 4

*Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 108 S.Ct. 636 (1988) 5, 6

*Wernecke v. Garcia,* 591 F.3d 386 (5th Cir. 2009) . . . . 24

*Whirlpool Corp v. Civil Rights Com'n*, 425 Mich. 527 (1986) . . . 23

*Whitman v. Mercy-Memorial Hosp*, 128 Mich. App. 155 (1983) . . 22

**STATUTES:**

Elliott-Larsen Civil Rights Act (MCL 37.2101 et. seq.) . . . . 10, 20, 21

MCL 380.10 . . . . . . . . . . 12, 13

MCL 380.1310b(5)(c). . . . . . . . . . 12

MCL 750.343a . . . . . . . . . . 8

**CONSTITUTIONS:**

U.S. Const. am 14 . . . . . . . . . 18

U.S. Const. art. III, § 2 . . . . . . . . 2

Michigan Const. 1963, art I, §17 . . . . . . . 18

Michigan Const., 1693, art. VIII, §2 . . . . . . . 17

**COURT RULES:**

Fed. R. Civ. P. 8(a)(2). . . . . . . . . 1

Fed. R. Civ. P. 12(b)(6) . . . . . . . . 1, 2

Fed. R. Civ. P. 56 . . . . . . . . . 2

GREAT LAKES JUSTICE CENTER

**<u>CONCISE STATEMENT IN SUPPORT OF PLAINTIFFS' POSITION</u>**

As outline below, Plaintiffs have standing to bring both federal and state claims against Defendants and this case is justiciable. Plaintiffs have suffered an injury-in-fact as to the federal claims and do have an individual interest as to the state claims, thus satisfying the requirements for standing. Further, Defendants violated Plaintiffs' constitutional and statutory rights through the adoption and implementation of the contested policies. For all the reasons stated below, these issues are ripe for this Court's review. Finally, qualified immunity does not bar Plaintiffs' claims. Plaintiffs request this Court to deny Defendants' Motion to Dismiss in its entirety.

GREAT LAKES JUSTICE CENTER

## STATEMENT OF FACTS

The Williamston Community School District Board of Education (WCS) adopted or amended numerous policies on October 2, 2017 and November 6, 2017. The policies at issue in this case are 4900, 7500, 8010, 8011, 8040, 8260-R, and 8720 (attached as Exhibit A). Plaintiffs Edward W. Reynolds and Erin L. Reynolds are married and have two children, A.R. and E.R., who were enrolled in at WCS. As a result of the newly-adopted policies and the discrimination against them and their beliefs, the Reynolds believe they had no alternative but to enroll their children in a private school.

Plaintiff Monica C. Schafer resides in the Williamston School District and is the mother of children who are currently enrolled at WCS. Plaintiff Christopher D. Johnecheck also resides in the Williamston School District and is the father of children who are currently enrolled at WCS. A.B. is a minor who currently attends WCS. Defendants violated Plaintiffs' constitutional and statutory rights, injured Plaintiffs, and the WCS policies must be overturned. Due to this matter being heard on a Fed. R. Civ. P. 12(b)(6) motion, the relevant facts and circumstances are contained in Plaintiffs' Complaint.

## STANDARD OF REVIEW

In order to prevail against a Motion to Dismiss under Rule 12(b)(6) for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to provide fair notice to the defendant of what the claim is and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *Sykes v. United States*, 507 Fed. Appx. 455, 457 (6th Cir. 2012) (Citing *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The Court must assume the factual allegations of the complaint are true and decide whether the complaint states a plausible claim for relief. *Id*. When ruling on a motion to dismiss under Rule

GREAT LAKES JUSTICE CENTER

1

12(b)(6), the Court may consider public records and exhibits attached to the complaint without converting the motion to one for summary judgment under Fed. R. Civ. P. 56. *Id.*

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING.

#### A.  The Federal Claims.

Article III of the U.S. Constitution grants the federal courts the authority to adjudicate actual "cases" or "controversies." U.S. Const. art. III, § 2.  As defined by the Supreme Court,

> A justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or abstract character, from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.  It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-241 (1937) (citations omitted).  Plaintiffs' claims are not "hypothetical," "abstract," or "moot;" Plaintiffs assert a "real and substantial controversy."  *Id.*  Likewise, Plaintiffs seek from this Court "specific relief through a decree of a conclusive character." *Id.* The United States Supreme Court also held:

> To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 162; 117 S.Ct. 1154 (1997). Plaintiffs have proper standing as to the federal claims because of the grounds underlying each count (Counts III, IV, V, VI, VIII, IX).

The following are examples of how Plaintiffs have been injured in this case:

- Defendants violated Plaintiffs' fundamental right to direct and control the upbringing and education of their children by adopting a policy (8011), whereby Defendants can refuse to notify a parent of the assertion of any gender or sexual orientation choice purportedly made by their child at school.

GREAT LAKES JUSTICE CENTER

- The result of Defendants' violations of Plaintiffs' rights required the Reynolds family, as a matter of conscience, to remove their children from the School District and place them in private school for their safety and wellbeing, thereby incurring additional costs and expenses.
- Defendants violated Plaintiffs' rights by adopting policies (8010 and 8011) which permit students and other individuals to use the showers, locker rooms, bathrooms and other facilities of the opposite sex.
- Defendants violated Plaintiffs' rights by threatening to punish or impose discipline on any student or parent for alleged violations of Defendants' new policies.
- Defendants violated Plaintiffs' of their personal choices central to individual dignity and autonomy, including intimate choices defining personal identity and beliefs by stigmatizing and labeling their sincerely held religious beliefs as discriminatory or acts of bullying.

In this case, all of Plaintiffs' injuries are a direct result of, and fairly traceable to, Defendants' adoption and implementation of the contested policies. "[C]ourts have routinely found sufficient adversity between the parties to create a justiciable controversy when suit is brought by the particular plaintiff subject to the regulatory burden imposed by a statute." *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 282 (6th Cir. 1997) (finding that gun manufacturers and dealers had standing to make a pre-enforcement challenge to a criminal statute that "targeted [them] for regulation"); *Doe v. Bolton*, 410 U.S. 179 (1973) (same); *see also Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1987) (holding that where a plaintiff "would be subject to application of the [challenged] statute," that is sufficient to confer standing). And when the plaintiff is the subject of the challenged action, as Plaintiffs here, "there is ordinarily little question that the action or inaction has caused him injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-562; 112 S.Ct. 2130 (1992).

Indeed, absent judicial relief, the policies hang over Plaintiffs' head "like the sword over Damocles, creating a 'here-and-now subservience.'" *See, e.g., Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noises, Inc.*, 501 U.S. 252, 265 n.13 (1991). The inevitable action causing harm—the enactment of the policies—has arrived. *See generally Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 418 (1942) (noting that the exercise of governmental rule-

3

making power "sets a standard of conduct for all to whom its terms apply, [and i]t operates as such *in advance of the imposition of sanctions* upon any particular individual," observing that "[i]t is common experience that men conform their conduct to regulations by governmental authority so as to avoid the unpleasant legal consequences which failure to conform entails") (emphasis added).

As a result, Plaintiffs are compelled to change their behavior to comply with Defendants' policies, and Plaintiffs need not wait for the inevitable additional future harm to seek relief from this Court. Plaintiffs have standing because they have alleged a "personal injury" that is "fairly traceable" to Defendants' policies and is "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751; 104 S.Ct. 3315 (1984). It is certain that Plaintiffs' injuries would be redressed by a favorable decision overturning said policies.

In *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir. 1985), Plaintiffs sued the city for violation of their constitutional rights because the city was renting part of the city airport to a catholic diocese at a favorable rate. The *Hawley* Court first analyzed *Sierra Club v. Morton*, 405 U.S. 727, 95 S.Ct. 1361 (1972) (While the Court held that Plaintiff did not have standing as a "representative of the public," Plaintiff could amend its complaint to make "allegations concerning individual members' use of the park being affected by the challenged action [which] would be sufficient to confer standing.") and *United States v. SCRAP*, 412 U.S. 669, 739-740; 93 S.Ct. 2405 (1973) (Holding that Plaintiffs alleging that a proposed railroad freight hike would discourage recycling of disposable cans and bottles and thus damage Washington area national parks was sufficient for standing.).

The *Hawley* Court then stated:

In *ACLU v. Rabun County*, 698 F.2d 1098 (11th Cir.1983), modifying, 678 F.2d 1379 (11th Cir.1982), plaintiffs, the ACLU and five individuals, brought suit alleging that the maintenance of a large, illuminated latin cross in a Georgia state park violated the Establishment Clause. The individual plaintiffs were residents of Georgia. Only one had actually seen the cross; the others learned of the cross from

anonymous phone calls and news releases. Two of the plaintiffs testified that they camped regularly, although not in the park where the cross was located. **Each of the individual plaintiffs testified that they would not use the state park as long as the cross remained there**, because of both its physical and meta-physical impact. **The court held that although the plaintiffs' underlying motivations could "be described as either a spiritual belief or a commitment to separation of church and state," they had "demonstrated an individualized injury, other than a mere psychological reaction, which they have suffered 'as a consequence' of the challenged action."** With regard to the two plaintiffs who testified that they were campers, the court found that they had sufficiently demonstrated particularized and personalized noneconomic injury to distinguish them from the general citizenry who may be as equally offended on a philosophical basis but who are not as specifically or perceptibly harmed, consistent with both the prior precedent defining noneconomic injuries in general and the decision in *Valley Forge*, to provide them with a "personal stake in the controversy."

*Hawley,* 773 F.2d at 740 (Emphasis added) (Internal citations omitted).

If Plaintiffs in *Rabun County* had standing, despite their distant connection to the location and cross in controversy, then certainly Plaintiffs in this case have standing. Plaintiffs are residents and pay taxes in the Williamston district, attend WCS as either parents or students, and have a "personal stake in the controversy." Further, just as in *Rabun County*, the Reynolds family in this case removed their children from WCS and, as a matter of conscience, cannot return unless the policies are rescinded.

Plaintiffs also have standing because of the serious First Amendment implications in this case. In *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 108 S.Ct. 636 (1988), Plaintiffs brought a lawsuit challenging a state statute regarding the display of potentially obscene materials in bookstores. The State argued that Plaintiffs lacked standing because the statute was recently enacted, had not yet been applied to Plaintiffs, and that Plaintiffs had not suffered sufficient harm. *Id.* at 392. However, the Supreme Court held:

We are not troubled by the preenforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. **Further, the alleged**

> **danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.**

*Id*. at 393 (Emphasis added). In this case, Plaintiffs raise serious First Amendment issues relating to both freedom of speech and freedom of religious expression. Plaintiffs have already been injured by the policies being adopted and implemented. Further, the polices now chill students' and parents' speech out of fear that if they speak to social issues, like marriage and gender identity, WCS will stigmatize and punish them.

### B. The State Claims.

Plaintiffs also have proper standing as to their state claims (Counts I, II, III, VII, and X). When a Plaintiff brings state claims in federal court, the federal court must apply that state's law as to standing. The Court of Appeals has held:

> A federal court cannot hear Myers's breach of contract claim **unless he has standing to sue under North Dakota state law**. See *Metropolitan Express Servs., Inc. v. City of Kansas City*, 23 F.3d 1367, 1369 (8th Cir. 1994) (applying state law of standing in federal diversity case); *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 747-48 (8th Cir. 1982) (**analyzing standing to raise a state claim in federal court under state law**).

*Myers v. Richland County*, 429 F.3d 740, 749 (8th Cir. 2005) (Emphasis added). See also, *Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768, 777 (D.C. Cir. 1982) (The Court analyzed *Rice v. President & Fellows of Harvard College*, 663 F.2d 336 (1st Cir. 1981) and noted that the Court of Appeals utilized a state Supreme Court decision to determine standing as to Plaintiff's state claims.) Thus, standing must be determined pursuant to Michigan law.

Michigan is not bound by the "case and controversy" language of Article III of the U.S. Constitution, and has a much broader approach to the issue of standing. The Michigan Supreme Court recently held:

> The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to "ensure sincere and vigorous advocacy." *Detroit Fire Fighters Ass'n v. Detroit*, 449 Mich. 629, 633, 537 N.W.2d 436 (1995). Thus, the standing

6

inquiry focuses on whether a litigant "is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable."

*Lansing Schools Educ. Ass'n v. Lansing Bd. of Educ.*, 487 Mich. 349, 355; 792 N.W.2d 686 (2010). The Court further held that "[g]enerally, the court exercised its discretion to hear a case if the citizen had 'some individual interest in the subject matter of [the] complaint which is not common to all the citizens of the state....'" *Id.* at 356. Plaintiffs have an interest in this case that is not common to all citizens of the state of Michigan. Plaintiffs reside in the Williamston school district, attended WCS, pay Williamston taxes, vote in Williamston elections, and have a deep and personal interest in how their local schools operate. This is enough to establish standing under Michigan law regarding Plaintiffs' state claims. The Michigan Supreme Court further held:

> References to standing became more frequent in Michigan's modern jurisprudence, and the doctrine was developed more extensively but **remained a prudential limit that could, within the Court's discretion, be ignored**. Further, the fact that there was a cause of action under law, or the Legislature expressly conferred standing, was sufficient to establish standing. **Where a party was seeking declaratory relief, the Court repeatedly held that meeting the requirements of the court rule governing declaratory actions was sufficient to establish standing**.

*Id.* at 356-357 (Emphasis added). Not only do Plaintiffs in this case meet the requirements for standing, this Court may ignore the standing requirements for Plaintiffs' state claims. Further, Plaintiffs are seeking declaratory relief in this case, which alone is sufficient to establish standing as to any state claims. Clearly, Plaintiffs have proper standing to raise their state claims.

## II.    PLAINTIFFS HAVE PROPERLY PLED VIOLATIONS OF THE LAW.

### A.    Count I – Defendants Acted Without Legal Authority.

The Michigan Elliott-Larsen Civil Rights Act (ELCRA) occupies the field of discrimination law in the area of education. It was outside the scope of WCS' authority to enact anti-discrimination policies when the Michigan Legislature has already passed laws in that field which preempt any locality's attempt to legislate in that area. The ACLU argued that *J.F.*

7

*Cavanaugh & Co. v. City of Detroit*, 126 Mich. App. 627, 337 N.W.2d 605 (1983) addressed the issue of whether ELCRA preempts school districts from adopting discrimination polices. However, *J.F. Cavanaugh* had nothing to do with schools, school districts, education, or whether ELCRA preempts school districts from adopting polices regarding discrimination. The court acknowledged this when it held:

> We will limit our consideration of the preemption question to the regulation of municipal contractors in the field of civil rights.

*Id*. at 632-633. ELCRA regulates discrimination on the basis of employment (Article 2), public accommodations (Article 3), education (Article 4), and real estate transactions (Article 5). *J.F. Cavanaugh* only dealt with whether ELCRA preempted policies regarding municipal contractors, an issue not present in this case. Moreover, it is understandable that the Court would issue such a holding, because ELCRA does not primarily regulate municipal contractors. However, ELCRA does specifically and exhaustively regulate discrimination in the realm of education (Article 4). Thus, *J.F. Cavanaugh* is wholly inapplicable to the case at bar and provides no insight as to whether ELCRA preempts in an area it explicitly regulates, i.e. education.

The Michigan Supreme Court outlined the elements a court must analyze to determine whether a statute passed by the Michigan Legislature occupies a field of law in *People v. Llewellyn*, 401 Mich. 314, 257 N.W.2d 902 (1977). In *Llewellyn*, the City of East Detroit passed its own criminal ordinances regarding obscenity. *Id*. at 319. However, at the time *Llewellyn* was decided, the Michigan Legislature already enacted statutes regarding criminal obscenity. MCL 750.343a. *Id*. The Court held:

> In making the determination that the state has thus preempted the field of regulation which the city seeks to enter in this case, we look to certain guidelines. First, where the state law expressly provides that the state's authority to regulate in a specified area of the law is to be exclusive, there is no doubt that municipal regulation is preempted. Second, preemption of a field of regulation may be implied upon an examination of legislative history. Third, the pervasiveness of the state regulatory

8

scheme may support a finding of preemption. While the pervasiveness of the state regulatory scheme is not generally sufficient by itself to infer preemption, it is a factor which should be considered as evidence of preemption. Fourth, the nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest.

*Id*. at 323-324 (Internal citations omitted).

Initially, the *Llewellyn* Court analyzed preemption in a similar case:

[W]here the Court has found that the nature of the subject matter regulated called for a uniform state regulatory scheme, supplementary local regulation has been held preempted. Especially pertinent to the instant case in this regard is *Walsh v. City of River Rouge*, supra, where this Court held preempted a municipal ordinance granting certain emergency powers to the mayor. **The subject matter of the ordinance in Walsh involved the potential restriction of important civil liberties of the people, as does the case before us. The Court apparently concluded that the protection of these important civil liberties demanded that the state retain sole control of the circumstances under which the emergency powers would be exercised.**

*Id*. at 325 (Emphasis added). Similarly, the case at bar involves the "potential restriction of important civil liberties of the people." Indeed, the fundamental rights of freedom of speech, religious exercise, and parental rights are just an example of the important civil rights at issue.

The Court analyzed whether Michigan's state obscenity statute expressly provides for preemption. Both in *Llewellyn* and the current case, the state statues (ELCRA and the state obscenity law) do not expressly provide for preemption.

The Court ultimately found preemption based upon the third and fourth factors of the test. The Court analyzed whether the state obscenity statute was a pervasive regulatory scheme:

In enacting the present statutory scheme, M.C.L.A. § 750.343a et seq.; M.S.A. § 28.575(1) et seq., the Legislature replaced its much simpler predecessor, M.C.L.A. § 750.343; M.S.A. § 28.575 with a detailed five-section statutory framework intended to define and regulate obscenity.

*Id*. at 326-327. The Court held that because the obscenity statute specifically addressed the conduct, penalty, definition, standards, etc., of obscenity, it was a clear indication of the Legislature's intent to occupy the field. *Id*.

Just as in *Llewellyn*, the Michigan Legislature passed ELCRA, which is a detailed, eight article, regulatory scheme for discrimination. If a simple criminal statute regarding obscenity preempts the field, then certainly an even more complex regulatory scheme regarding discrimination is a pervasive regulatory scheme. For example, ELCRA:

- Defines and provides for the different classifications of discrimination that are prohibited. MCL 37.2102(1).
- Provides with particularity the definitions and standards, not only for the whole Act, but in particular for the field of education. MCL 37.2103 and 37.2401.
- Extensively and thoroughly regulates numerous different types of discrimination in the field of education and dedicates an entire article of the act to discrimination in the field of education. MCL 37.2401, 37.2402, 37.2402a, 37.2403, 37.2404, 37.2404a.
- Provides for the type of regulation and punishment for engaging in discrimination. MCL 37.2801, 37.2802, 37.2803.
- Provides for a mechanism for appeal and for *de novo* judicial review. MCL 37.2606.
- Regulates the entire Civil Rights Commission, whose sole function is to investigate and adjudicate discrimination issues. MCL 37.2601, 37.2602.

Unmistakably, the Michigan Legislature established a highly pervasive regulatory scheme when it enacted ELCRA, especially in the field of education. ELCRA not only defines the types of discrimination prohibited in education, it establishes procedures, methods of investigation, and adjudication of discriminatory acts in the field of education.

The *Llewellyn* Court held:

The breadth and detail of this statutory scheme provides an indication that the Legislature has preempted the definition and deterrence of criminal obscenity, at least to the exclusion of a supplementary ordinance such as the one before us, which seeks to establish its own definition and test for obscenity, to modify the state standards for a prima facie case of the prohibited conduct, and to alter the state prescribed punishment upon conviction.

This conclusion is buttressed by the fact that, for reasons discussed below, the definition and prohibition of obscenity offenses is clearly an area of the law which demands uniform, statewide treatment.

**First, it seems clear that if each locality in the state of Michigan were allowed to establish its own definition of obscenity, a great deal of uncertainty and confusion would be created.** We observe that no less than the United States Supreme Court has had over a period of decades considerable difficulty in defining the line between obscenity and protected speech and determining what material constituted obscenity under such a definition. To allow each of the multitude of Michigan localities to establish its own definition of obscenity would be to invite

10

the cultivation of a legal thicket which would make both the scope of the individual right to free expression and the permissible prohibition of obscenity well-nigh impossible to determine.

**Second, a balkanized system of obscenity definition and prohibition would, through the resultant confusion and provocation of endless appeals, both threaten important individual rights and undermine efficiency in the control of obscenity.**

*Id.* at 327-328 (Emphasis added). One could replace "obscenity" with "educational discrimination" in the above quote, and the Court's holding would perfectly apply to this case. The Michigan Legislature enacted ELCRA to establish a uniform, state-wide standard for discrimination in the field of education. As of 2017, Michigan has 538 different public-school districts (Local Educational Authorities or Agencies) and 301 Public School Academies that adopt and establish their own policies and procedures.[1] It is highly unlikely that the Michigan Legislature, when enacting ELCRA, intended to permit 839 different variations, policies, procedures, punishments, etc. for each school in the state. To the contrary, it is clear that a uniform system is crucial to the proper and consistent enforcement against prohibited educational discriminatory conduct.

Finally, it is important to note that Plaintiffs are not claiming that ELCRA preempts all laws regarding all types of discrimination in all areas of life. Rather, Plaintiffs are arguing that ELCRA preempts in the fields it specifically regulates, i.e., discrimination in the areas of employment, education, public accommodations, and real property transfers. The *Llewellyn* Court acknowledged this principle because it held that while the legislature's criminal obscenity statute preempts local criminal ordinances, it does not preempt all fields of obscenity, such as municipal zoning. *Id.* at 320.

It is also of the utmost importance that any student facing allegations of discriminatory conduct be afforded due process through consistent policies and procedures. This cannot occur if

---

[1] According to the Michigan Department of Education,
http://www.michigan.gov/documents/numbsch_26940_7.pdf.

GREAT LAKES JUSTICE CENTER

there are 839 different educational discrimination policies in the state. It is clear that ELCRA satisfies the final two factors of the *Llewellyn* test because ELCRA is both a pervasive regulatory scheme and the issue of educational discrimination demands uniformity throughout the state. Therefore, Defendants policies (7500, 8010, 8011, 8040, and 8720) are all invalid because they regulate discrimination in the field of education which is preempted by ELCRA.[2]

**B. Count II – The School District Violated the Matt Epling Safe School Law.**

The Matt Epling Safe School Law (MCL 380.1310b(5)(c)) (Safe School Law) provides that all school district bullying policies must include "[a] provision indicating that all pupils are protected under the policy and that bullying is equally prohibited **without regard to its subject matter or motivating animus**" (emphasis added). A plain review of WCS policies reveals a violation of the Safe School Law because they refer to specific subject matters and motivating animus by adding and specifically listing new privileged categories to its bullying and gender identity policies (8011 and 8260-R). WCS' policy does not comply with state law and must only state that all bullying is prohibited, regardless of subject matter, motivating animus, or category.

**C. Count III – Parent's Fundamental Constitutional Rights.**

MCL 380.10 states:

It is the natural, fundamental right of parents and legal guardians to determine and direct the care, teaching, and education of their children. The public schools of this state serve the needs of the pupils by cooperating with the pupil's parents and legal guardians to develop the pupil's intellectual capabilities and vocational skills in a safe and positive environment.

Further, the United States Supreme Court held:

The liberty interest at issue in this case—**the interest of parents in the care, custody, and control of their children— is perhaps the oldest of the**

---

[2] Just to be clear, Plaintiffs do not allege ELCRA preempts a local school district's bullying policy because the legislature specifically directs local school districts to adopt bullying policies pursuant to the Safe School Law. Rather, Plaintiff does assert that Defendants violated the Safe School Law because they specifically list discriminatory categories, instead of properly stating that all bullying is prohibited without regard to any subject matter or motivating animus.

GREAT LAKES JUSTICE CENTER

**fundamental liberty interests recognized by this Court.** More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and **"to control the education of their own."** Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535(1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in Pierce that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id*., at 535. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

*Troxel v. Granville*, 530 U.S. 57, 65-66; 120 S.Ct. 2054 (2000) (Emphasis added).

Thus, parents not only have a fundamental right to direct and control the upbringing of their children, but public schools have an affirmative duty to cooperate with a child's parents pursuant to MCL 380.10. It cannot be overstated that a parent has a fundamental right to not only be informed, but also be actively involved with a minor who is contemplating gender identity issues. The family's belief system, religion, and numerous other factors all affect how gender identity issues are handled. However, the WCS policy permits school administrators and faculty to exclude parents from this important issue regarding their child. Policy 8011 (emphasis added) states:

> WCS shall accept the gender identity that each student asserts reflecting the student's legitimately held belief **once the student _and/or_ his or her parent/guardian, as appropriate**, notifies District administration that the student intends to assert a gender identity that differs from previous representations or records.

The policy, by its clear and unambiguous language, permits a student "or" his or her parent/guardian to notify the district administration about a change in gender identity. Thus, under the policy, any student, in his or her sole judgment, may notify WCS of a change in gender identity and WCS must accept such a change. The policy later states that WCS must merely "consider"

GREAT LAKES JUSTICE CENTER

their "responsibility to keep parents informed," rather than affirmatively requiring parental notification, involvement, and consent. The WCS policies infringe upon parental rights by permitting minors, in their sole discretion, to change their gender without any parental involvement or consent. This policy runs afoul of clear Supreme Court precedent and "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id*. at 66. Defendants' policy is unconstitutional.

### D. Count IV – Right to Privacy, Personal Autonomy, and Personal Identity.

The Supreme Court's recent ruling in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), affirmed a constitutional right of personal identity and personal autonomy for all citizens. The Court held that one's right of personal identity precluded any state from proscribing same-sex marriage. *Obergefell* held "[t]he Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Id*. at 2593.

Because this Court defined a fundamental liberty right as including "most of the rights enumerated in the Bill of Rights," and "liberties [that] extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," this evolved right of personal identity must also comprehend factual contexts well beyond same-sex marriage. *Id*. at 2597. This right of personal identity applies not just to those who find their identity in their sexuality and sexual preferences—but also to citizens who define their identity by their religious beliefs.

Many Christian people, for example, find their identity in Jesus Christ and the ageless, sacred tenets of His word in the Holy Bible. For followers of Jesus, adhering to his commands is the most personal choice central to their individual dignity and autonomy. A Christian whose

identity inheres in their religious faith orientation, is entitled to at least as much constitutional protection as those who find their identity in their sexual preference orientation. There can be no doubt that this right of personal identity protects against government authorities who use public policy to persecute, oppress, and discriminate against Christian people.

According to *Obergefell*, beyond the First Amendment religious liberty protections expressly enshrined in the Bill of Rights, the substantive due process right to personal identity now provides Christian and other religious people additional constitutional protection. Henceforth, government action not only must avoid compelling a religious citizen to facilitate or participate in policies that are contrary to their freedoms of expression and religious conscience protected by the First Amendment, but it must also refrain from violating their personal identity rights secured by substantive due process.

Pursuant to policies 8010 and 8011, once a student asserts a gender change to the district, the district will grant that student "equal access" to everything the school offers, including bathrooms, locker rooms, and showers. It is important to note that Defendants were careful in their motion to only state that the "policies do not facially state that bathrooms and locker rooms will be shared by males and females."[3] However, Defendants do not deny, and therefore acknowledge, that the actual result of their policies will be that males and females will share bathrooms and locker rooms.

Forcing biological girls to share bathrooms, locker rooms, and showers, with intact biological males (or *vice versa*), not only invades Plaintiffs' privacy, but also infringes on their right to personal autonomy, personal identity, and dignity as established in *Obergefel*, supra. The contested policies in this case, including polices 8010 and 8011, violate Plaintiffs' right to personal

---

[3] See Defendants' Motion to Dismiss, pg. 4.

GREAT LAKES JUSTICE CENTER

identity and dignity as they force Plaintiffs to share bathrooms, locker rooms, and showers with members of the opposite biological sex. As stated before, Plaintiffs find their identity in their religious faith and it is against their religion to share such facilities with members of the opposite sex. Therefore, Defendants' policies violate Plaintiffs' rights as established in *Obergefel*, supra.

### E. Counts V and VI – Freedom of Speech and Free Exercise of Religion.

It is a very common religious belief, and one that Plaintiffs in this case sincerely hold, that individuals should not observe members of the opposite biological sex undress to the point of nakedness or near nakedness, or shower with members of the opposite sex. Absent particular circumstances, such as marriage or a medical examination, Plaintiffs believe it is against their religion to use bathrooms, locker rooms, or showering facilities where members of the opposite sex have unlimited access and use. Defendants' policies infringe on Plaintiffs' beliefs by imposing an unconstitutional choice on Plaintiffs, either lose full use and access to the public schools and their facilities (and the stigma and discrimination that would accompany a student daily refusing to use the public-school facilities), or violate their religious beliefs. This violates Plaintiffs' right to the free exercise of their religion.

In addition, the contested policies now permit WCS to discipline and sanction any student or parent who speaks out against these policies. These policies have a chilling effect on Plaintiffs and other students' speech because they are now afraid that if they speak up and support traditional views, WCS will discipline and sanction the student.

In *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), Plaintiff was in the University of Utah's Actor Training Program. *Id*. at 1280. Because of her religious beliefs, she refused to use profanity or do nude scenes as a part of her training. *Id*. at 1280 and 1281. The Plaintiff in that case was forced between leaving the program or violating her religious beliefs. Id. at 1282. While talking to her instructor, Plaintiff said "If I do not—and this is what you said—modify my values

by the end of the semester, I'm going to have to find another program. Is that right?" *Id*. Plaintiff's instructor responded, "Well yes. We talked about that, yes." *Id*. This is the exact same choice Defendants have forced upon Plaintiffs in this case, either modify their religious values, or leave. Unfortunately, as a direct result of Defendants policies, some Plaintiffs in this case have already been forced to make that choice and left WCS. Again, "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Id*. at 1284.

Finally, the Michigan Constitution guarantees to all Michigan citizens the right to the benefit of a free public education. See Michigan Const., 1963, art. VIII, §2. The United States Supreme Court has explicitly rejected that a person can be forced to choose between a government benefit and following his or her religion. "In *Sherbert*, *Thomas*, and the present case, the employee was forced to choose between fidelity to religious belief and continued employment; the forfeiture of unemployment benefits for choosing the former over the latter brings unlawful coercion to bear on the employee's choice." *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 144; 107 S.Ct. 1046 (1987). In the same way, it is unconstitutional for WCS to force Plaintiffs to choose between following their religion and receiving a free public education. Defendants' policies violated Plaintiffs' First Amendment rights.

**F. Count VII – Michigan Constitutional Violations.**

Plaintiffs incorporate all arguments from the other corresponding counts regarding freedom of speech, freedom of religion, and discrimination as restated herein as applied to their Michigan Constitutional claims.

**G. Count VIII – Title IX Violation.**

"Title IX provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

17

any education program or activity receiving Federal financial assistance[.]' 20 U.S.C. Sec. 1681(a)." *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994).

Defendants do not assert that Plaintiffs' claims of Title IX violations are facially invalid, and they do not discuss any of the merits of Plaintiffs' Title IX claims. Instead, Defendants merely argue that Plaintiffs do not have standing to raise Title IX because they did not suffer any injury. Plaintiffs therefore incorporate their entire argument above regarding standing.

The *Horner* Court also held:

> Congress has made clear its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs. We will not defeat that purpose by recognizing artificial distinctions in the structure or operation of an institution.

*Id.* Plaintiffs, in particular A.R., E.R., and A.B. were all students at WCS and are directly affected by Defendants' conduct and policies. Plaintiffs were eligible to join any WCS athletic activities offered. However, Plaintiffs have suffered a loss of opportunity, in violation of Title IX as they must now compete against both sexes for limited spots on a single-sex athletic team.

For example, A.B. must now compete not only against other girls for a spot on the girls' basketball team, but she must now compete against any boys who believe they are girls (Policy 8011). Permitting a biological boy to take the spot of a biological girl is, by definition, a loss of opportunity for the girl and a direct violation of Title IX. In addition, because A.R. and E.R. were forced to leave WCS because of the contested policies, they have suffered a loss because they can no longer compete on any of Williamston's athletic teams.

## H. Count IX – Constitutional Vagueness Violations.

The Due Process clauses of the United States Constitution and the Michigan Constitution require that the law provide predictability for all citizens. U.S. Const. am 14; Michigan Const. 1963, art I, §17. All government enactments must be clear and unambiguous. Further, "[a]lthough

GREAT LAKES JUSTICE CENTER

GREAT LAKES JUSTICE CENTER

the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine "is not actual notice, but the other principal element of the doctrine--the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983) The new, protected categories in Defendants' policies are incapable of clear definition. A person can be accused and charged under the vague terms of such categories for merely expressing a religious belief that another individual internally defines as being offensive to him or her. The determination of whether a person is a member of one of the new protected classes is subjective and in the eye of the beholder. A person cannot know if their conduct is prohibited until after the fact. Thus, even if a parent or student possesses no intent to offend or discriminate, the alleged victim can commence enforcement of this policy and subject the accused to legal costs and sanctions.

For example, a category like "gender expression" (as used in the contested policies) is beyond understanding legally. It is impossible to know what such language, however it is defined, truly means. Categories like "gender identity" and "sexual orientation" have meaning way beyond just homosexuality (as they are never defined in the policies). Therefore, an accuser gets to define what this language means without limit by simply filing charges alleging some statement or action violates the policy.

Some definitions of "sexual orientation" routinely list different lifestyles and then qualify the list by stating, "by orientation or practice, whether past or present." Since the sexual orientation of the relevant group is never defined in the policies, no reasonable person can understand what it means. Sexual orientation comes in many forms. Does the policy cover groups of people with various sexual orientations? Does it cover the conduct of a group of people whose sexual orientation is for extramarital sex (swingers/adulterers)? Does it cover the conduct of a group of

people whose sexual orientation is for multiple partners within a marital relationship (polygamists)? Does it cover numerous other groups whose activities are currently illegal?

Given the absence of any clear definition, the ambiguous language of the policies arguably could include any and all such groups. Will an otherwise law abiding parent or student, therefore, face enforcement action for calling pedophilia or polygamy bad or for refusing to accommodate such a person? An individual's inalienable right to due process and notice forbids such government-imposed guessing games, especially when, as here, the public has no way of predicting what morally-relative choice the proponents will choose when making a decision to take enforcement action against an alleged perpetrator. Thus, the conduct prohibited by such proposed categories wholly depends on the whim of the accuser, based upon their perceived feelings—rather than a clearly expressed standard articulated in the policy. Again, who determines this? Such language is nebulous at best and citizens are left to guess at the meaning. The new categories are vague and ambiguous and must be struck down.

## I.   Count X – Elliott-Larsen Civil Rights Act Violation (ELCRA).

The preamble of ELCRA states the legislature's intent (Emphasis added):

> AN ACT to define civil rights; **to prohibit discriminatory practices, <u>policies,</u> and customs** in the exercise of those rights based upon religion, race, color, national origin, age, sex, height, weight, familial status, or marital status . . .

ELCRA states that a "political subdivision" is considered a "person" under the Act. MCL 37.2103(g). ECLRA defines "political subdivision" as "a county, city, village, township, **school district**, or special district or authority of the state." MCL 37.2103(h) (Emphasis added). ELCRA further states:

> (i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and **other verbal or physical conduct or communication of a sexual nature under the following conditions:** . . .

> (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, **public accommodations or public services, education,** or housing, **or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.**

MCL 37.2103(i) (Emphasis added). In summary, Defendants are covered under the Act, and they may not enact policies which substantially interfere with an individual's public accommodations or education by creating an intimidating, hostile, or offensive environment.

Defendants' conduct and communication in the case was the adoption and implementation of the contested policies. Defendants' policies allow members of the opposite sex to strip naked and shower together which is inherently sexual in nature. To be sure, in any other context, a man and woman disrobing and showering together would be sexual in nature. This policy has deprived Plaintiffs of full access to Defendants' public accommodation.

Plaintiffs cannot have full use and enjoyment of the locker room where they may undress and shower only under the condition that a person of the opposite biological sex be permitted to join, unannounced, at any time. It was Defendants' conduct in creating the policy that created the illegally discriminatory environment.

Michigan courts routinely analyze whether a *policy,* in and of itself, can violate ELCRA. Again, ELCRA's preamble states that the purpose of the law is "to prohibit discriminatory practices, **policies**, and customs.…" Preamble to Michigan Public Act 453 of 1976 (Emphasis added). The legislative intent is clear that ELCRA applies to *policies*.

The Michigan Supreme Court addressed this point:

> **When there is any doubt about the meaning of statutory language, we have stated that "a court must look to the object of the statute, the harm which it is designed to remedy, and apply a reasonable construction which best accomplishes the statute's purpose."** We have also stated that statutory language must be interpreted in light of "'the subject matter and ... the general scope of the

*GREAT LAKES JUSTICE CENTER*

provision, and ... in light of the general purpose sought to be accomplished or the evil sought to be remedied by the ... statute.'"

\*\*\*

**The purposes of the Civil Rights Act as declared by the Legislature are, in relevant part: "[T]o define civil rights; to prohibit discriminatory practices, <u>policies</u>, and customs in the exercise of those rights based upon religion, race, color, national origin, age, sex, height, weight, or marital status;** ... [and] to provide remedies and penalties...." Preamble to 1976 P.A. 453. …

**These provisions, and §§ 301 and 302, clearly express the Legislature's intent to** "eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases," and **guarantee to all Michigan citizens equal access to businesses that offer goods and services to the public. <u>Moreover, the Civil Rights Act is remedial in nature and must be liberally construed to provide a broad remedy</u>**.

*Kassab v. Michigan Basic Property Ins Ass'n*, 441 Mich. 433, 449-451 (1992) (internal citations omitted) (emphasis added) (overruled in part by *Haynes v. Neshewat*, 441 Mich. 433 (2007), holding that the *Kassab* holding was too limited and that ELCRA is to provide an even broader remedy). Moreover, the Court made it clear that courts can properly rely on the preamble of ELCRA to determine legislative intent. *Id*. It affirmed that such statutory interpretations should be construed liberally to provide plaintiffs with a broad remedy. *Id*.

Numerous courts have analyzed whether policies violated ELCRA. In *Whitman v. Mercy-Memorial Hosp*, 128 Mich. App. 155 (1983), the Court of Appeals analyzed whether a hospital's policy, which did not allow an unmarried father to be present during his child's birth, violated ELCRA. The Court held:

> Had plaintiffs Whitman and Coch been married to one another, it is clear that under defendant's policy Coch would have been permitted into the delivery room as Whitman's nonmedical support person. **Therefore, defendant's <u>policy</u> clearly violated the above statutory provision against discrimination on the basis of marital status.**

*Id*. at 160 (Emphasis added). Notably, the Court did not dismiss the case simply because Plaintiff sued over a mere policy. The Court held that adopting and implementing a policy, in and of itself, can violate ELCRA. Michigan courts recognize that it is proper for the court to review policies for ELCRA violations. See, e.g., *Scalise v. Boy Scouts of America*, 265 Mich. App. 1 (2005),

GREAT LAKES JUSTICE CENTER

*Whirlpool Corp v. Civil Rights Com'n*, 425 Mich. 527 (1986), *Department of Civil Rights ex rel Forton v. Waterford Tp Dept of Parks and Recreation*, 425 Mich. 173 (1986). It is clear from the above-cited case law, and the explicit intent of the legislature, that a policy can violate ELCRA.

Defendants' policy creates a hostile sexual environment for individuals within their respective bathrooms, locker rooms, and showers. In *Miller v. CA Muer Corp*, 420 Mich. 355 (1985), Plaintiff sued for discrimination under ELCRA based on Defendants' policy that prohibited married couples from working together. Defendants argued that their policy was facially neutral and thus could not violate ELCRA. The Court stated that "[w]e remand, however, for further consideration because impermissible discrimination may occur in the application of a policy not facially discriminatory." *Id*. at 358. Further, the Supreme Court held:

> We turn to the argument that the instant antinepotism policies are discriminatory as applied to Miller and Lowry. **A facially neutral employment practice can operate as a mask or pretext for impermissible discrimination**. Thus our decision that the instant policies are facially neutral concerning the criterion of whether one is married does not preclude a finding that Miller and Lowry were nevertheless discriminated against because of their marital status or for some other impermissible reason. **Because summary judgments were entered in the instant cases, there are no factual records concerning the application of the antinepotism policies.** Therefore, these cases are remanded for further proceedings.

*Id*. at 365-366 (Emphasis added). The Court held that such policies can be discriminatory and one of the key factors is how the policy was created, instituted, and applied, which is a factual finding.

Defendants' policy (8011) permits anyone who asserts a "legitimately held belief" of being the opposite sex to have "equal access" to everything offered at WCS, which includes restrooms, locker rooms, and showers. The true effect of the policy is that all men can have access to the women's locker room (and *vice versa*) by simply claiming to have a "legitimately held belief." Any man can shower with women under the pretext of having a "legitimately held belief" that he is transgender. Such an offensive and irresponsible policy creates a hostile sexual environment and

GREAT LAKES JUSTICE CENTER

puts all women at risk. This would be equally true if it were a woman having a "legitimately held belief" that she was a man.

This lawsuit was filed because Defendants created a hostile sexual environment for students. The fact that Defendants' policy discriminates against both men and women who value their privacy and that of their children makes it more discriminatory, not less. If it is sexual harassment for a man to verbally demand to take showers with a woman, then certainly a policy which actually enables that man to physically take showers with a woman must be sexual harassment as well. Defendants' policy creates a hostile sexual environment which substantially interferes with Plaintiffs' use and enjoyment of Defendants' public accommodation and it interferes with Plaintiffs' education. The policy must be struck down.

## III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

In *Saucier v. Katz,* 533 U.S. 194 (2001), the U.S. Supreme Court articulated a two-step sequence for resolving government officials' qualified immunity claims. "*Saucier* required that lower courts consider first, whether the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law, and second, if a violation has been alleged, whether the right was clearly established at the time of the alleged government misconduct." *Wernecke v. Garcia,* 591 F.3d 386, 392 (5th Cir. 2009). In *Pearson v. Callahan*, 555 U.S. 223, 227 (2009), the Court held that "the *Saucier* procedure should not be regarded as an inflexible requirement."

In *O'Donnell v. Brown*, 335 F.Supp.2d 787 (W.D. Mich. 2004), the court discussed the standard regarding clearly established rights and stated:

> "The determination as to whether the right was 'clearly established' is a determination that 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." "The relevant, dispositive inquiry in determining

GREAT LAKES JUSTICE CENTER

whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." As the Sixth Circuit has explained, "[t]he standard of objective reasonableness requires us to ask whether every 'officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'"

*Id*. at 822-823 (Internal citations omitted).

Plaintiffs have alleged clear violations of constitutional rights in their complaint and as outlined above. These rights were all clearly established and any reasonable educator would not only know of those rights, but also know not to violate them. Defendants knew, or should have known, that their actions in this case violated Plaintiffs' rights. Because proper violations of the constitution have been alleged and those rights are clearly established, Defendants are not entitled to qualified immunity.

Finally, qualified immunity does not protect a defendant against claims for declaratory and injunctive relief. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841, n.5 (1998) (noting that qualified immunity is unavailable "in a suit to enjoin future conduct . . ."); *see also Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) ("[C]laims for injunctive and declaratory relief are unaffected by qualified immunity."); *Hall v. Tollett*, 128 F.3d 418, 430 (6th Cir. 1997). The primary relief sought by Plaintiffs is to have the contested policies struck down and such relief is wholly unaffected by qualified immunity.

## CONCLUSION

For all the above reasons, Plaintiffs state valid claims and hereby request this Honorable Court deny Defendants' Motion to Dismiss and grant such other and further relief as is just and appropriate.

Respectfully submitted,

DATED: April 25, 2018.

*/s/ David A. Kallman*
David A. Kallman          (P34200)

25

**<u>PROOF OF SERVICE</u>**

David A. Kallman hereby states that he did serve a copy of Plaintiffs' Response to Defendants' Motion to Dismiss on April 25, 2018 pursuant to Fed. R. Civ. P. 5(d) via the United States District Court for the Western District of Michigan electronic filing system.

<div align="right">

*/s/ David A. Kallman*
_____
David A. Kallman            (P34200)
Attorney for Plaintiffs

</div>

<div style="writing-mode: vertical">GREAT LAKES JUSTICE CENTER</div>