# EXHIBIT 1

 Neutral
As of: March 8, 2020 5:51 PM Z

# *Parents for Privacy v. Barr*

United States Court of Appeals for the Ninth Circuit

July 11, 2019, Argued and Submitted, Portland, Oregon; February 12, 2020, Filed

No. 18-35708

**Reporter**
2020 U.S. App. LEXIS 4503 *; 949 F.3d 1210; 2020 WL 701730

PARENTS FOR PRIVACY; JON GOLLY; KRIS GOLLY, individually and as guardians ad litem for A.G.; NICOLE LILLIE; MELISSA GREGORY, individually and as guardian ad litem for T.F.; PARENTS RIGHTS IN EDUCATION, an Oregon nonprofit corporation; LINDSAY GOLLY, Plaintiffs-Appellants, v. WILLIAM P. BARR, Attorney General; BETSY DEVOS; U.S. DEPARTMENT OF EDUCATION; UNITED STATES DEPARTMENT OF JUSTICE; DALLAS SCHOOL DISTRICT NO. 2, Defendants-Appellees, BASIC RIGHTS OREGON, Intervenor-Defendant-Appellee.

**Prior History: [*1]** Appeal from the United States District Court for the District of Oregon. D.C. No. CV 17-1813 HZ. Marco A. Hernández, District Judge, Presiding.

*Parents for Privacy v. Dallas Sch. Dist. No. 2, 326 F. Supp. 3d 1075, 2018 U.S. Dist. LEXIS 123567 (D. Or., July 24, 2018)*

**Disposition:** AFFIRMED.

**Summary:**

**SUMMARY**[*]

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## Civil Rights

The panel affirmed the district court's dismissal of an action alleging that an Oregon public school district violated Title IX, as well as the constitutional rights of students and of parents, when it allowed transgender students to use school bathrooms, locker rooms, and showers that match their gender identity rather than the biological sex they were assigned at birth.

The Dallas School District No. 2 implemented a Student Safety Plan after a student who had been born and who remained biologically female publicly identified as a boy, and asked school officials to allow him to use the boys' bathroom and locker room. The Plan acknowledged the student as a "transgender male" and permitted him to use the boys' locker room and bathroom facilities with his peers. The Plan provided that the student could use any of the bathrooms in the building to which he identified sexually. The Student Safety Plan also provided, among other things, that all staff would receive training and instruction regarding Title IX, and that teachers **[*2]** would teach about anti-bullying and harassment.

The panel held that there is no *Fourteenth Amendment* fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth. Thus, the panel held that plaintiffs failed to show that the contours of the privacy right protected by the *Fourteenth Amendment* were so broad as to protect against the School District's implementation of the Student Safety Plan. This conclusion was supported by the fact that the Student Safety Plan provided alternative options and privacy protections to those who did not want to share facilities with a transgender student, even though those alternative options admittedly appeared inferior and less convenient.

The panel held that the Student Safety Plan sought to

avoid discrimination and ensure the safety and well-being of transgender students; it did not violate Title IX. Thus, the panel held that a policy that treats all students equally does not discriminate based on sex in violation of Title IX, and that the normal use of privacy facilities does not constitute actionable sexual harassment under Title IX just because a person is transgender. The panel stated that just because **[*3]** Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity. Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity.

The panel held that the *Fourteenth Amendment* does not provide a fundamental parental right to determine the bathroom policies of the public schools to which parents may send their children, either independent of the parental right to direct the upbringing and education of their children or encompassed by it. The panel stated that given that Supreme Court and Ninth Circuit case law not only have not recognized the specific rights asserted by plaintiffs, but further foreclosed recognizing such rights as being encompassed by the fundamental parental rights protected by the *Fourteenth Amendment's Due Process Clause*, amendment of this claim would be futile.

The panel held that the Student Safety Plan was rationally related to a legitimate state purpose and did not infringe plaintiffs' *First Amendment* free exercise rights because it did not target religious conduct. The panel held that because the **[*4]** Student Safety Plan qualified as neutral and generally applicable, it was not subject to strict scrutiny. The panel rejected plaintiffs' argument that strict scrutiny was required because plaintiffs alleged multiple constitutional claims concerning fundamental rights.

The panel concluded that the district court did not err by failing to allow plaintiffs leave to replead because the problem with plaintiffs' complaint was not the sufficiency of their factual allegations, but rather that plaintiffs' legal theories failed. Amending the complaint would not change, for example, the extent of the rights that are protected by the *Fourteenth Amendment's Due Process Clause*. As a result, the panel affirmed the district court's denial of leave to amend.

**Counsel:** J. Ryan Adams (argued), Canby, Oregon; Herbert G. Grey, Beaverton, Oregon; for Plaintiffs-Appellants.

Dennis Fan (argued) and Marleigh D. Dover, Appellate Staff; Billy J. Williams, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees William P. Barr, Betsy DeVos; U.S. Department of Education, and United States Department of Justice.

Blake H. Fry (argued) and Peter R. Mersereau, Mersereau **[*5]** Shannon LLP, Portland, Oregon, for Defendants-Appellees Dallas School District No. 2.

Gabriel Arkles (argued) and Shayna Medley-Warsoff, American Civil Liberties Union Foundation, New York, New York; Peter D. Hawkes and Darin M. Sands, Lane Powell PC, Portland, Oregon; Matthew W. dos Santos and Kelly Simon, ACLU Foundation of Oregon; for Intervenor-Defendant-Appellee.

Jesse Ryan Loffler, Cozen O'Connor, Pittsburgh, Pennsylvania, for Amici Curiae Transgender Students and Allies.

Anthony Todaro, Jeffrey DeGroot, and Rachael Kessler, DLA Piper LLP (US), Seattle, Washington; Fatima Goss Graves, Emily Martin, Neena Chaudhry, and Sunu P. Chandy, National Women's Law Center, Washington, D.C.; for Amicus Curiae National Women's Law Center.

Wesley R. Powell, Mary Eaton, and Patricia O. Haynes, Willkie Farr & Gallagher LLP, New York, New York; Arthur L. Coleman, Education Counsel LLC, Washington, D.C.; for Amici Curiae National PTA, GLSEN, American School Counselor Association, and National Association of School Psychologists.

Devi M. Rao, Jenner & Block LLP, Washington, D.C.; Andrew G. Sullivan, Jenner & Block LLP, Los Angeles, California; for Amici Curiae American Academy of Pediatrics, American **[*6]** Medical Association, American Public Health Association, and 13 Other Medical, Mental Health, and Other Health Care Organizations.

2020 U.S. App. LEXIS 4503, *6

John C. Dwyer, Maureen P. Alger, Sarah R. Binning, and Emily B. Harrington, Cooley LLP, Palo Alto, California; Kyle Wong, Cooley LLP, San Francisco, California; Shannon Minter, Amy Whelan, and Asaf Orr, National Center for Lesbian Rights, San Francisco, California; Shawn Meerkamper, Transgender Law Center, Oakland, California; for Amici Curiae PFLAG Inc., Trans Youth Equality Foundation, Gender Spectrum, Gender Diversity, and Transactive Gender Project.

Alice O'Brien, Eric A. Harrington, and Gypsy M. Moore, National Education Association, Washington, D.C., for Amicus Curiae National Education Association.

Ellen F. Rosenblum, Attorney General; Benjamin Gutman, Solicitor General; Jona J. Maukonen, Assistant Attorney-In-Charge; Office of the Attorney General, Salem, Oregon; for Amicus Curiae State of Oregon.

Cynthia Cook Robertson, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Tara L. Borelli, Lambda Legal Defense and Education Fund Inc., Atlanta, Georgia; Richard M. Segal and Nathaniel R. Smith, Pillsbury Winthrop Shaw Pittman LLP, San Diego, California; [*7] Robert C.K. Boyd and William C. Miller, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Peter C. Renn, Lambda Legal Defense and Education Fund Inc., Los Angeles, California; for Amici Curiae School Administrators from Thirty States and the District of Columbia.

George G. Gordon, Ryan M. Moore, and Thomas J. Miller, Dechert LLP, Philadelphia, Pennsylvania; Steven M. Freeman, Kimberley Plotnik, David Barkey, and Melissa Garlick, Anti-Defamation League, New York, New York; for Amici Curiae Anti-Defamation League; Americans United for Separation of Church and State; Bend the Arc Jewish Action; Central Pacific Conference of the United Church of Christ; Corvallis-area Lavender Women; Greater Seattle Business Association; Hadassah, The Women's Zionist Organization of America, Inc.; Human Rights Campaign; Jewish Council for Public Affairs; Jewish Federation of Greater Portland; Keshet: For LGBTQ Equality in Jewish Life; National Center for Transgender Equality; National Center for Youth Law; National Council of Jewish Women; National Queer Asian Pacific Islander Alliance; OCA - Asian Pacific American Advocates; People For the American Way Foundation; Public Counsel; South

Asian Americans [*8] Leading Together; Union for Reform Judaism; and Central Conference of American Rabbis.

**Judges:** Before: A. Wallace Tashima, Susan P. Graber, and John B. Owens, Circuit Judges. Opinion by Judge Tashima.

**Opinion by:** A. Wallace Tashima

# Opinion

TASHIMA, Circuit Judge:

This case concerns whether an Oregon public school district may allow transgender students to use school bathrooms, locker rooms, and showers that match their gender identity rather than the biological sex they were assigned at birth. Plaintiffs oppose the school district's policy, asserting that it violates Title IX, as well as the constitutional rights—including the right to privacy, the parental right to direct the education and upbringing of one's children, and the right to freely exercise one's religion—of students and of parents of students in the school district. Defendants and many *amici* highlight the importance of the policy for creating a safe, non-discriminatory school environment for transgender students that avoids the detrimental physical and mental health effects that have been shown to result from transgender students' exclusion from privacy facilities that match their gender identities.

It is clear that this case touches on deeply personal [*9] issues about which many have strong feelings and beliefs. Moreover, adolescence and the bodily and mental changes it brings can be difficult for students, making bodily exposure to other students in locker rooms a potential source of anxiety—and this is particularly true for transgender students who experience gender dysphoria. School districts face the difficult task of navigating varying student (and parent) beliefs and interests in order to foster a safe and productive learning environment, free from discrimination, that accommodates the needs of all students. At the outset, we note that it is not our role to

pass judgment on the school district's policy or on how the school district can best fulfill its duty as a public educational institution. We are asked only to resolve whether the school district's policy violates Title IX or Plaintiffs' constitutional rights.

In a thorough and well-reasoned opinion, the district court dismissed the federal causes of action against the school district for failure to state a claim upon which relief can be granted.[1] *Parents for Privacy v. Dallas Sch. Dist. No. 2, 326 F. Supp. 3d 1075 (D. Or. 2018)*. We agree with the district court and hold that there is no *Fourteenth Amendment* fundamental privacy right to avoid all risk of intimate exposure to or **[*10]** by a transgender person who was assigned the opposite biological sex at birth. We also hold that a policy that treats all students equally does not discriminate based on sex in violation of Title IX, and that the normal use of privacy facilities does not constitute actionable sexual harassment under Title IX just because a person is transgender. We hold further that the *Fourteenth Amendment* does not provide a fundamental parental right to determine the bathroom policies of the public schools to which parents may send their children, either independent of the parental right to direct the upbringing and education of their children or encompassed by it. Finally, we hold that the school district's policy is rationally related to a legitimate state purpose, and does not infringe Plaintiffs' *First Amendment* free exercise rights because it does not target religious conduct. Accordingly, we affirm the district court's dismissal with prejudice of the action.

I.

In September 2015, a student at Dallas High School who had been born and who remained biologically female publicly identified as a boy, and he asked school officials to allow him to use the boys' bathroom and locker room.[2] Defendant-Appellee Dallas School District

No. 2 **[*11]** (the "District") responded by creating and implementing a "Student Safety Plan" for the transgender boy ("Student A") and any other transgender student who might make a similar request in the future, in order to ensure that transgender persons like Student A could safely participate in school activities.

The Plan acknowledged Student A as a "transgender male" and permitted him to use the boys' locker room and bathroom facilities with his peers at Dallas High School.[3] The Plan also provided that, while Student A had not indicated "which bathroom he feels comfortable using," Student A could "use any of the bathrooms in the building to which he identifies sexually." In addition, to ensure Student A's safety, the Student Safety Plan provided that all staff would receive training and instruction regarding Title IX, that teachers would teach about anti-bullying and harassment, that the Physical Education ("PE") teacher would be first to enter and last to leave the locker room, and that Student A's locker would be in direct line of sight of the PE teacher in the coach's office. The Student Safety Plan also listed several "Safe Adults" with whom Student A could share any concerns.

Student **[*12]** A began using the boys' locker room and changing clothes "while male students were present." This caused several cisgender boys "embarrassment, humiliation, anxiety, intimidation, fear, apprehension, and stress," because they had to change clothes for their PE class and attend to their needs while someone who had been assigned the opposite sex at birth was present.[4] Although privacy stalls were available in the bathrooms, these were insufficient to alleviate the cisgender boys' fear of exposing themselves to Student A, because the stalls had gaps through which "partially unclothed bodies" could "inadvertently" be seen. And an

---

[1] The district court also dismissed Plaintiffs' claims under Oregon state law, but Plaintiffs do not challenge that portion of the district court's order on appeal.

[2] For the purposes of this appeal, which is taken from the dismissal of Plaintiffs' complaint, we draw the facts from the complaint's well-pleaded factual allegations and from the exhibits attached to the complaint. See *Outdoor Media Grp., Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007)* ("When ruling on a motion to dismiss, we may 'generally consider only allegations contained in the pleadings, exhibits

attached to the complaint, and matters properly subject to judicial notice.'" (quoting *Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007)* (per curiam))).

[3] The District also planned to spend between $200,000 and $500,000 upgrading the high school's bathrooms and locker rooms to better accommodate their use by transgender students.

[4] In the District, PE is a mandatory course for two or more years of school, and students must change into and out of clothing appropriate for PE class at the beginning and end of each PE class. Some of the cisgender boys who had PE during the same class period as Student A changed into their PE clothes as quickly as possible as a result of their anxiety that Student A might see them in a partial state of undress.

available single-user bathroom was often inconvenient or was considered inferior because it lacked a shower. As a consequence of their fear of exposure to Student A, some cisgender boys began using the restroom as little as possible while at school, and others risked tardiness by using distant restrooms during passing periods in order to try to find a restroom in which Student A was unlikely to be present.

When parents and other students in the Dallas community became aware of the Student Safety Plan, many opposed it publicly at successive school board meetings, [*13] in an effort to dissuade the District from implementing the policy. Some parents in the District are concerned and anxious about the prospect of their children using locker rooms or bathrooms together with a student who was assigned the opposite biological sex at birth. The Student Safety Plan also interferes with some parents' preferred moral and/or religious teaching of their children concerning modesty and nudity. In addition, several cisgender girls suffered from stress and anxiety as a result of their fear that a transgender girl student who remains biologically male would be allowed to use the girls' locker room and bathroom. Girls had the option of changing in the nurse's office, but it was on the other side of the school.

Students who opposed the Student Safety Plan attempted to circulate a petition opposing the policy, but the high school principal confiscated the petitions and ordered students to discontinue doing so or face disciplinary action. Despite the objections raised by several parents and students, the District continued to allow Student A to use the bathroom and locker room that matched the gender with which he identified.

II.

In November 2017, Plaintiffs-Appellants [*14] Parents for Privacy, Parents' Rights in Education, and several individuals (collectively, "Plaintiffs")[5] sued the District,

the Oregon Department of Education, the Governor of Oregon, and various federal officials and agencies (collectively, the "Federal Defendants"),[6] arguing that the Student Safety Plan violates the Constitution and numerous other laws. The complaint alleges eight claims:

(1) violation by the Federal Defendants of the Administrative Procedure Act, *5 U.S.C. §§ 551-559*;

(2) violation by the District and the Federal Defendants of the Fundamental Right to Privacy under the *Fourteenth Amendment to the Constitution*;

(3) violation by the District and the Federal Defendants of Parents' Fundamental Right to Direct the Education and Upbringing of Their Children under the *Fourteenth Amendment*;

(4) violation by the District of Title IX, *20 U.S.C. §§ 1681-1688*;

(5) violation by the Federal Defendants of the Religious Freedom Restoration Act of 1993, *42 U.S.C. § 2000bb-2000bb-4*;

(6) violation by the District and the Federal Defendants of the *First Amendment's* Guarantee of Free Exercise of Religion;

---

Plaintiff Parents for Privacy is an unincorporated association whose members included, at the time of filing, current and former students and parents of current and former students in the District, as well as "other concerned members of the District community." Plaintiff Parents' Rights in Education is a nonprofit "whose mission is to protect and advocate for parents' rights to guide the education of their children."

[6] The Federal Defendants are the U.S. Department of Justice, U.S. Department of Education, Attorney General, and Secretary of Education. These defendants were involved at various times in the issuance and enforcement of a number of guidance documents that initially promoted accommodation of transgender students in public schools, including on Title IX grounds. Subsequently, some of those guidance documents were withdrawn, and others were later superseded by contrary guidance documents. Plaintiffs asserted that, notwithstanding the withdrawal of the relevant guidance documents, the Federal Defendants, in part, caused the District to adopt the Student Safety Plan, because the guidance "has not been formally repealed, and it has continuing legal force and effect [that is] binding" upon the Dallas School District. Thus, the complaint seeks to enjoin the Federal Defendants from "taking any action" based on their previous guidance.

---

[5] The individual plaintiffs are or were students ("Student Plaintiffs") or parents of students ("Parent Plaintiffs") in the District. Specifically, Plaintiff Lindsay Golly formerly attended Dallas High School during the 2015-2016 school year while the Plan was in place. Plaintiffs Kris Golly and Jon Golly are her parents, as well as the parents of their son A.G., who at the time of filing was an eighth-grade student who would soon attend Dallas High School. Plaintiff Melissa Gregory is a parent of T.F., who at the time of filing was a student at Dallas High School.

(7) violation by the District, the Governor of Oregon, and the Oregon Department of Education of Oregon's Public Accommodation Discrimination law, *Or. Rev. Stat. § 659A.885*; and

(8) violation by the District of Oregon's Discrimination in Education law, *Or. Rev. Stat. § 659.850*.

Plaintiffs **[*15]** sought to enjoin Defendants from enforcing the Student Safety Plan, and they sought a court order requiring the District to mandate that students use only the bathrooms, locker rooms, and showers that match their biological sex assigned at birth.

Upon the parties' stipulation, Plaintiffs' claims against Oregon Governor Kate Brown and the Oregon Department of Education were voluntarily dismissed on *Eleventh Amendment* grounds.[7] ,[8]

Thereafter the District, Basic Rights Oregon, and the Federal Defendants each moved to dismiss Plaintiffs' complaint. In a lengthy, detailed, and careful opinion, the district court granted all three motions and dismissed the case with prejudice. *Parents for Privacy, 326 F. Supp. 3d at 1111*. The court dismissed the claims against the District and Basic Rights Oregon on the merits under *Federal Rule of Civil Procedure 12(b)(6)*, concluding that Plaintiffs had failed to state claims upon which relief could be granted because the legal theories on which Plaintiffs' claims were premised failed, and that amendment of the claims would therefore be futile. *Id. at 1092-1110*.

Separately, the court addressed the Federal Defendants' motion to dismiss Plaintiffs' claims against the Federal Defendants for lack of standing, and concluded that Plaintiffs indeed lacked Article III standing **[*16]** to bring their claims against the Federal Defendants. The court explained that Plaintiffs had not established causation or redressability with respect to the Federal Defendants, because the District had adopted the Student Safety Plan "in response to Student A's accommodation requests, not [the] Federal

Defendants' actions," and the District would "retain[] the discretion to continue enforcing the Plan" notwithstanding any relief against the Federal Defendants. *Id. at 1087-92*.

Plaintiffs appealed the district court's dismissal order, arguing that the district court erred by dismissing, for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*, their Title IX and constitutional claims against the District. Plaintiffs further contend that the district court committed reversible error in failing to provide Plaintiffs an opportunity to amend their complaint and instead dismissing the case with prejudice.

III.

We have jurisdiction under *28 U.S.C. § 1291*, and we review de novo the grant of a *Rule 12(b)(6)* motion to dismiss for failure to state a claim upon which relief may be granted. *Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1203 (9th Cir. 2005), amended on denial of reh'g by 447 F.3d 1187 (9th Cir. 2006)* (per curiam). Under *Rule 12(b)(6)*, a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle **[*17]** the complainant to relief. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *see also Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (holding that a claim must be facially plausible in order to survive a motion to dismiss). In assessing whether a plaintiff has stated a claim, we accept as true all well-pleaded factual allegations, and construe all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008)*. However, we are not required to accept as true legal conclusions couched as factual allegations. *Iqbal, 556 U.S. at 678*; *Fayer v. Vaughn, 649 F.3d 1061, 1064 (9th Cir. 2011)* (per curiam).

Dismissal of a complaint without leave to amend is improper unless it is clear, on de novo review, that the complaint could not be saved by any amendment. *See Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)* (per curiam); *Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000)* (en banc). "A district court acts within its discretion to deny leave to amend when amendment would be futile . . . ." *V.V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas, LLC, 946 F.3d 542, 547 (9th Cir. 2019)* (ellipsis in original) (quoting *Chappel v. Lab. Corp. of Am., 232 F.3d 719, 725 (9th*

---

[7] Those two dismissed defendants later requested and were granted leave to appear as *amici*.

[8] Also, Basic Rights Oregon, a non-profit LGBTQ advocacy organization that had been involved in the development and implementation of the Student Safety Plan, moved to intervene as a defendant, which the district court granted.

*Cir. 2000))*.

**IV.**

On appeal, Plaintiffs challenge the district court's dismissal of their claims that the District violated: (1) the *Fourteenth Amendment* right to privacy; (2) Title IX; (3) the *Fourteenth Amendment* right to direct the education and upbringing of one's children; and (4) the *First Amendment's Free Exercise Clause*.[9] We address each claim seriatim.

A.

First, Plaintiffs challenge the district court's dismissal of their claim for violation of a fundamental right to privacy under the *Fourteenth Amendment*.

The *Fourteenth Amendment* provides that no state **[*18]** shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The *Fourteenth Amendment's Due Process Clause* "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)* (internal quotation marks and citations omitted). The Supreme Court has recognized that "one aspect of the 'liberty' protected by the *Due Process Clause of the Fourteenth Amendment* is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'" *Carey v. Population Servs. Int'l, 431 U.S. 678, 684, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977)* (quoting *Roe v. Wade, 410 U.S. 113, 152, 93 S. Ct. 705, 35 L. Ed. 2d 147, (1973))*. This right includes "at least two constitutionally protected privacy interests: the right to control the

─────────────────────────

[9] In their opening brief, Plaintiffs do not challenge or discuss the district court's ruling that Plaintiffs lacked Article III standing to sue Federal Defendants as a result of Plaintiffs' failure to establish causation and redressability. We therefore do not review the district court's dismissal of Plaintiffs' claims against Federal Defendants. *See Mandelbrot v. J.T. Thorpe Settlement Trust (In re J.T. Thorpe, Inc.), 870 F.3d 1121, 1124 (9th Cir. 2017)* ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief." (quoting *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jasika, Inc., 752 F.2d 1401, 1404 (9th Cir. 1985)))*.

disclosure of sensitive information and the right to 'independence [in] making certain kinds of important decisions.'" *Fields, 427 F.3d at 1207* (quoting *Whalen v. Roe, 429 U.S. 589, 599-600, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977)*; *see also Marsh v. County of San Diego, 680 F.3d 1148, 1153 (9th Cir. 2012)*).

Plaintiffs contend that the privacy protections afforded by the *Fourteenth Amendment's Due Process Clause* also encompass a "fundamental right to bodily privacy" that includes "a right to privacy of one's fully or partially unclothed body and the right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex." Further, they assert that "[f]reedom from the risk of compelled **[*19]** intimate exposure to the opposite sex, especially for minors, is a fundamental right deeply rooted in this nation's history and tradition and is also implicit in the concept of ordered liberty." Because the District's Student Safety Plan allegedly infringes these rights by "requir[ing] Student Plaintiffs to risk being intimately exposed to those of the opposite biological sex . . . without any compelling justification," Plaintiffs contend that the District violated their fundamental *Fourteenth Amendment* rights.

The district court dismissed this claim on the ground that the complaint did not allege infringement of any constitutionally protected right. It concluded that the *Fourteenth Amendment* does not provide high school students with a constitutional privacy right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs. *Parents for Privacy, 326 F. Supp. 3d at 1099*.

In reaching this conclusion, the district court examined the authorities on which Plaintiffs relied, but rejected those cases as inapposite because, unlike the scenario presented in this case, those cases "involve[d] egregious state-compelled intrusions into one's personal privacy," such as "government officials"—often law enforcement or correctional **[*20]** officers—"viewing or touching the naked bodies of persons of the opposite sex against their will." *Id.* For example, the district court noted that *York v. Story, 324 F.2d 450, 452 (9th Cir. 1963)*, the Ninth Circuit case that Plaintiffs claim provides the basis for their asserted right to bodily privacy, "involved a male police officer taking unnecessary nude photographs of a female victim in provocative positions and circulating them to other officers." *Parents for Privacy, 326 F. Supp. 3d at 1097*. Similarly, the Ninth Circuit in *Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir. 1992)*, determined that a male parole officer violated a female parolee's right to bodily

privacy by entering her bathroom stall over her objections and remaining in the stall while she "finished urinating, cleaned herself, and dressed." *Parents for Privacy, 326 F. Supp. 3d at 1097*. And, the district court noted, *Byrd v. Maricopa County Sheriff's Department, 629 F.3d 1135, 1137 (9th Cir. 2011)*, concerned a strip search by a female cadet of a male detainee in the presence of approximately three dozen cadets and detention officers as well as other male detainees, which the Ninth Circuit determined violated the *Fourth Amendment's* prohibition on unreasonable searches. *Parents for Privacy, 326 F. Supp. 3d at 1097*.

Because "none of these cases support[ed] the proposition that high school students have a fundamental right not to share restrooms and locker rooms with transgender students who have a different assigned sex than theirs," the district **[*21]** court concluded that "Plaintiffs have failed to sufficiently allege a fundamental right to privacy cognizable under the *Fourteenth Amendment*."[10]*Id. at 1096-99*. It explained that "[t]o hold otherwise would sweepingly expand the right to privacy beyond what any court has recognized," in contravention of the Supreme Court's reluctance to expand the "short list" of liberty rights protected by the *Due Process Clause*, including "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id. at 1099* (quoting *Glucksberg, 521 U.S. at 720*). Thus, because "[t]he potential threat that a high school student might see or be seen by someone of the opposite biological sex while either are undressing or performing

———————————

[10] For further support for the obvious distinction between Plaintiffs' cited cases and the circumstances presented in this case, the district court pointed to several out-of-circuit cases similar to this one in which courts also rejected Plaintiffs' purported privacy interest, in favor of transgender students' access to school facilities. *Parents for Privacy, 326 F. Supp. 3d at 1093-96*; *see, e.g., Doe ex rel. Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 531 (3d Cir. 2018)* ("[W]e decline to recognize such an expansive constitutional right to privacy—a right that would be violated by the presence of students [in restrooms or locker rooms] who do not share the same birth sex."), *cert. denied*, **139 S. Ct. 2636, 204 L. Ed. 2d 300 (2019)**; *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1052 (9th Cir. 2017)* ("A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of . . . any other student who used the bathroom at the same time."), *cert. dismissed*, **138 S. Ct. 1260, 200 L. Ed. 2d 415 (2018)**.

bodily functions in a restroom, shower, or locker room does not give rise to a constitutional violation," the district court concluded that Plaintiffs failed to state a claim for violation of the *Fourteenth Amendment*. *See id.*

On appeal, Plaintiffs make several ultimately unavailing arguments about why the district court erred in dismissing their privacy rights claim under the *Fourteenth Amendment*. First, they argue **[*22]** that the Ninth Circuit in *York, 324 F.2d at 455*, recognized the right to bodily privacy when it commented that "[t]he desire to shield one's unclothed figure from views of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." The problem with this argument is that *York* addressed an egregious privacy violation by police and recognized a much more specific and limited Due Process privacy right than Plaintiffs claim here. As noted, *York* involved a male police officer who coerced a female assault victim to allow him to take unnecessary nude photographs of her, which he later distributed to other officers. *See id. at 452*. In discussing the plaintiff's claim for violation of her fundamental right to privacy under the *Fourteenth Amendment*, we explained:

> We are not called upon to decide as an original proposition whether 'privacy,' as such, is comprehended within the 'liberty' of which one may not be deprived without due process of law, as used in the *Due Process Clause of the Fourteenth Amendment*. For it has already been declared by the Supreme Court that the security of one's privacy *against arbitrary intrusion by the police* is basic to a free society and is therefore 'implicit in the concept of ordered liberty,' embraced **[*23]** within the *Due Process Clause of the Fourteenth Amendment*.

*Id. at 454-55* (emphasis added) (footnote omitted).

Thus, *York* recognized an established right to be free from arbitrary police intrusions upon one's privacy under the *Fourth Amendment*. *See id. at 455* ("A search of one's home has been established to be an invasion of one's privacy against intrusion by the police, which, if 'unreasonable,' is arbitrary and therefore banned under the *Fourth Amendment*. We do not see how it can be argued that the searching of one's home deprives him of privacy, but the photographing of one's nude body, and the distribution of such photographs to strangers does not." (footnote omitted)). Thus, *York* did not recognize a more general right to be free from alleged privacy intrusions by other non-government persons, or a privacy right to avoid any risk of being exposed briefly to

opposite-sex nudity by sharing locker facilities with transgender students in public schools.

Moreover, the actions that the Ninth Circuit concluded made the police's intrusion in *York* so arbitrary as to rise to the level of a violation of the plaintiff's privacy right under the *Due Process Clause* were far more invasive than the transgender student's actions alleged in this case. In *York*, we explained:

> [W]e [cannot] imagine a more arbitrary police [*24] intrusion upon the security of [a person's] privacy than for a male police officer to unnecessarily photograph the nude body of a female citizen who has made complaint of an assault upon her, over her protest that the photographs would show no injuries, and at a time when a female police officer could have been, but was not, called in for this purpose, and to distribute those photographs to other personnel of the police department despite the fact that such distribution of the photographs could not have aided in apprehending the person who perpetrated the assault.

*Id.* Here, Plaintiffs do not allege that transgender students are taking nude photographs of them or purposefully taking overt steps to invade their privacy for no legitimate reason. Thus, beyond failing to support the broad privacy right claimed by Plaintiffs, *York* is also readily distinguishable on its facts.

Next, Plaintiffs point to out-of-circuit cases to argue that the *Fourteenth Amendment* protects a "privacy interest in [a person's] *partially* clothed body." *See, e.g., Doe v. Luzerne County, 660 F.3d 169, 175-76 & 176 n.5 (3d Cir. 2011)*. But beyond the fact that those cases are not binding, none of them directly supports Plaintiffs' argument that the Constitution affords a broad privacy right protecting [*25] against being exposed in even a partial state of undress to any person of the opposite sex, whether or not they are a government actor. For example, *Luzerne County* involved the unconsented and surreptitious filming of a female deputy sheriff by male superior officers while she was completely undressed, and the subsequent sharing of the video footage and still photos. *See id. at 171-73, 175-78*. The Third Circuit analyzed whether the public disclosure of those files violated constitutional "protect[ions] against public disclosure [of] . . . highly personal matters representing the most intimate aspects of human affairs," *id. at 176* (second alteration in original) (quoting *Nunez v. Pachman, 578 F.3d 228, 232 (3d Cir. 2009)*), noting that "a person's right to avoid disclosure of personal matters

is not absolute," *id. at 178*, because "[d]isclosure may be required if the government interest in disclosure outweighs the individual's privacy interest," *id.* (quoting *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia, 812 F.2d 105, 110 (3d Cir. 1987)*). Thus, both the facts and the legal issue in *Luzerne* are distinguishable from the case at bench, because this case does not involve a privacy intrusion by government officers or the public disclosure of photos or video footage.[11]

Finally, Plaintiffs attempt to support [*26] their *Fourteenth Amendment* argument by pointing to cases suggesting that providing separate restrooms for males and females is not illegal, cases discussing *Fourth Amendment* violations, and cases addressing whether Title VII protects against discrimination on the basis of sexual orientation or gender identity. Those cases, however, are inapposite; none establishes a *Fourteenth Amendment* right to privacy that protects against any risk of bodily exposure to a transgender student in school facilities.

In sum, Plaintiffs fail to show that the contours of the privacy right protected by the *Fourteenth Amendment* are so broad as to protect against the District's implementation of the Student Safety Plan.[12] This

---

[11] Other cases cited by Plaintiffs are similarly inapposite. *Poe v. Leonard, 282 F.3d 123 (2d Cir. 2002)*, also involved the surreptitious and unconsented filming of a female officer by a male law enforcement officer. *See id. at 138*. The court concluded that the plaintiff had stated a claim for a violation of her *Fourteenth Amendment* privacy rights because the officer's behavior constituted "arbitrary government action" that "shock[ed] the conscience" and was "without any reasonable justification in the service of a legitimate governmental objective." *Id. 139* (quoting *County of Sacramento v. Lewis, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998))*. Again, the instant case does not involve an arbitrary privacy intrusion by a law enforcement officer in the form of unconsented filming.

Similarly, *Canedy v. Boardman, 16 F.3d 183 (7th Cir. 1994)*, is distinguishable because it involved a non-emergency strip search of a male inmate by two female deputies, even though other male officers were nearby and could have conducted the search. *See id. at 184-85*.

[12] As a result, Plaintiffs' argument that the District placed an unconstitutional condition on their privacy rights by implementing the Student Safety Plan also fails. If the asserted right is not protected by the Constitution, then any conditions that the District allegedly placed on the asserted

conclusion is supported by the fact that the Student Safety Plan provides alternative options and privacy protections to those who do not want to share facilities with a transgender student, even though those alternative options admittedly appear inferior and less convenient. *See Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 678 (9th Cir. 1998)* (suggesting that in cases in which privacy interests must be weighed against governmental interests, inconvenience and slight discomfort that results from attempting to accommodate both interests are not enough to establish a privacy violation).

Accordingly, we affirm the district [*27] court's dismissal with prejudice of Plaintiffs' claim for violation of privacy under the *Fourteenth Amendment's Due Process Clause*. *See Albright v. Oliver, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)* (holding that the plaintiff's *§ 1983* claim failed where the plaintiff failed to establish that he was deprived of a substantive due process right secured by the Constitution). Because this claim is premised on the violation of an asserted right that, as a matter of law, is not protected by the *Fourteenth Amendment's Due Process Clause*, amendment of this claim would be futile.[13]

**B.**

Next, Plaintiffs contend that the district court erred in failing to recognize that the District's policy violates Title IX by turning locker rooms, showers, and multi-user restrooms into sexually harassing environments and by forcing students to forgo use of such facilities as the solution to harassment.

---

right cannot be constitutionally impermissible. *See Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 604, 133 S. Ct. 2586, 186 L. Ed. 2d 697 (2013)* ("[T]he unconstitutional conditions doctrine . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up.").

[13] Because we agree with the district court that the right to privacy on which Plaintiffs' claim is premised is not protected by the Constitution, we do not reach the district court's further conclusions that: (1) even if the right asserted by Plaintiffs were protected by the Constitution, the presence of a transgender student in school facilities does not infringe that right, *see Parents for Privacy, 326 F. Supp. 3d at 1100-01*; and (2) policies permitting transgender access further a compelling state interest in protecting transgender students from discrimination and are narrowly tailored to satisfy strict scrutiny. *Id.*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." *20 U.S.C. § 1681(a)*. Plaintiffs allege that the Student Safety Plan violates Title IX because it "produces unwelcome sexual harassment and create[s] a hostile environment on the basis of sex." They allege that [*28] the Plan "needlessly subjects Student Plaintiffs to the risk that their partially or fully unclothed bodies will be exposed to students of the opposite sex and that they will be exposed to opposite-sex nudity, causing the Student Plaintiffs to experience embarrassment, humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity." According to Plaintiffs, "[a]llowing people to use restrooms, locker rooms or showers designated for the opposite biological sex violates privacy and creates a sexually harassing environment," in part because "[e]xposure to opposite-sex nudity creates a sexually harassing hostile environment." As a result of this allegedly harassing environment, "all Student Plaintiffs find that school has become intimidating and stressful," and some of them "are avoiding the restroom" and "are not able to concentrate as well in school."

Stating a Title IX hostile environment claim requires alleging that the school district: (1) had actual knowledge of; (2) and was deliberately indifferent to; (3) harassment because of sex that was; (4) "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access [*29] to the educational opportunities or benefits provided by the school." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 650, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)*; *see also Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738-39 (9th Cir. 2000)*. The district court ruled that Plaintiffs had failed to establish the third and fourth elements and, on that basis, dismissed Plaintiffs' Title IX hostile environment claim. *Parents for Privacy, 326 F. Supp. 3d at 1104*.

The district court concluded that the alleged harassment was not discrimination *on the basis* of sex within the meaning of Title IX, because the "District's plan does not target any Student Plaintiff because of their sex." *Id. at 1102*. Rather, the Student Safety Plan applies to all students regardless of their sex, and therefore "Student Plaintiffs have not demonstrated that they are being treated any differently from other students at Dallas High School."

In addition, the district court held that Plaintiffs failed to show "that the District's Plan discriminates because of sex, or that it creates a severe, pervasive, and objectively offensive environment." *Id. at 1104*. The court explained that, in contrast to cases involving "egregious and persistent acts of sexual violence and verbal harassment," "[c]ourts have recognized that the presence of transgender people in an intimate setting does not, **[*30]** by itself, create a sexually harassing environment that is severe or pervasive." *Id. at 1102*; *see also id. at 1102-04* (discussing cases). Noting Plaintiffs' failure to cite supporting authority, the district court rejected Plaintiffs' arguments that harassment was pervasive because the District's Plan is "widely applied" and that the Plan is objectively offensive because sex-segregated facilities are the well-established norm. *Id. at 1103-04*.

Again, we agree with the district court's analysis and find Plaintiffs' contrary arguments unpersuasive. First, Plaintiffs argue broadly that Title IX "unequivocally uphold[s] the right to bodily privacy" and therefore requires that facilities be segregated based on "biological" sex rather than "gender identity." To support this argument, Plaintiffs point out that the statute provides that it should not be construed to "prohibit any educational institution . . . from maintaining separate living facilities for the different sexes," *20 U.S.C. § 1686*, and that Title IX's implementing regulations specifically authorize providing separate but comparable "toilet, locker room, and shower facilities on the basis of sex," *34 C.F.R. § 106.33*. Plaintiffs further argue that Title IX's text and its legislative history make clear **[*31]** that the permitted basis on which such "separate" facilities may be segregated—"sex"—refers to "biological sex" as assigned at birth, and cannot encompass gender identity.

But just because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity. Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity. That is, Title IX does not specifically make actionable a school's decision not to provide facilities segregated by "biological sex"; contrary to Plaintiffs' suggestion, the statute does not create distinct "bodily privacy rights" that may be vindicated through suit. Instead, Title IX provides recourse for discriminatory treatment "on the basis of sex." *20 U.S.C. § 1681(a)*. Thus, even if Plaintiffs are correct that "Congress

intended to preserve distinct privacy facilities based on biological sex" and that the District chose not to do so, that fact alone is insufficient to state a legally cognizable claim under Title IX. Rather, to show that the District **[*32]** violated Title IX, Plaintiffs must establish that the District had actual knowledge of and was deliberately indifferent to harassment because of sex that was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis, 526 U.S. at 650*; *see also Reese, 208 F.3d at 739*.

Plaintiffs focus on the third and fourth elements of a Title IX hostile environment claim, as did the district court, namely whether there was harassment because of sex that was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to the educational opportunities or benefits provided by Dallas High School. First, Plaintiffs assert that the Student Safety Plan created harassment on the basis of sex "because the only way to achieve the policy's purpose of opposite-sex affirmation is to select facilities based on the sex (or gender identity) of users." But just because the Student Safety Plan implicitly addresses the topics of sex and gender by seeking to accommodate a transgender student's gender identity, or because it segregates facilities by gender identity, does not mean that the Plan harasses other students on **[*33]** the basis of their sex. As the district court explained, the Plan does not target students or discriminate against them on the basis of their sex; the Student Safety Plan treats all students—male and female—the same. *See Parents for Privacy, 326 F. Supp. 3d at 1096-97*.

Plaintiffs respond that the district court's conclusion that there was no harassment based on sex because the Student Safety Plan affects all students equally is "legally and logically indefensible." Plaintiffs argue that the fact that the Student Safety Plan affects both sexes does not preclude a Title IX violation, because the Plan actually harasses both sexes on the basis of their sex by allowing students assigned the opposite sex at birth to enter privacy facilities. But Plaintiffs cite no authority to support the notion that "equal harassment" against both sexes is cognizable under Title IX.

To the contrary, treating both male and female students the same suggests an absence of gender/sex animus, while Title IX is aimed at addressing discrimination based on sex or gender stereotypes. Numerous courts have ruled that a Title IX sexual harassment hostile environment claim fails where the alleged harassment is

inflicted without regard to gender or sex, i.e., where [*34] there is no discrimination. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist., 276 F. Supp. 3d 324, 394-95 (E.D. Pa. 2017)* (collecting cases), *aff'd, 897 F.3d 518 (3d Cir. 2018), cert. denied, 139 S. Ct. 2636, 204 L. Ed. 2d 300 (2019).* We see no reason to arrive at a different conclusion here. Plaintiffs' argument that the alleged harassment was "based on sex" because it involved opposite-sex nudity conflates the basis for the perceived harm—a distinction between biological sexes—with the basis for the alleged harassment, which, as discussed above, Plaintiffs have not shown was discriminatory or motivated by any gender animus. In sum, the district court correctly ruled that Plaintiffs failed to establish the third element of their Title IX claim. *See Parents for Privacy, 326 F. Supp. 3d at 1102.*

The district court also correctly ruled that Plaintiffs failed to establish the fourth element of their Title IX claim. *See id. at 1104.* Plaintiffs argue that they satisfy the fourth element of a hostile environment claim because the alleged harassment is both viewed subjectively as harassment by the victims and is, objectively, sufficiently severe or pervasive that a reasonable person would agree that it is harassment. However, even crediting Plaintiffs' subjective perceptions, under the totality of the circumstances, the alleged harassment is not so severe, pervasive, and objectively offensive to rise [*35] to the level of a Title IX violation. Plaintiffs do not allege that transgender students are making inappropriate comments, threatening them, deliberately flaunting nudity, or physically touching them. Rather, Plaintiffs allegedly feel harassed by the mere presence of transgender students in locker and bathroom facilities. This cannot be enough. The use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender. *See Cruzan v. Special Sch. Dist., # 1, 294 F.3d 981, 984 (8th Cir. 2002)* (per curiam) (concluding that a transgender woman's "merely being present in the women's . . . restroom" did not constitute actionable sexual harassment of her female co-workers); *cf. Davis, 526 U.S. at 650, 652-53* (explaining that "peer harassment . . . is less likely to [violate Title IX] than is teacher-student harassment" in part because "simple acts of teasing and name-calling among school children" do not establish severe harassment, and noting that "[t]he most obvious example of student-on-student sexual harassment capable of triggering a damages claim would . . . involve the overt, physical deprivation of access to school resources," for example by making effective physical threats). [*36]

Accordingly, we affirm the district court's dismissal with prejudice of Plaintiffs' Title IX hostile environment claim. Because the Student Safety Plan does not discriminate on the basis of sex, amendment would be futile.

**C.**

Next, Plaintiffs challenge the dismissal of their *Fourteenth Amendment* claim for violation of Parent Plaintiffs' fundamental rights to direct the care, education, and upbringing of their children.

As discussed above, the *Fourteenth Amendment's Due Process Clause* "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Glucksberg, 521 U.S. at 720-21* (internal quotation marks and citations omitted). The Supreme Court has held that one such fundamental liberty interest protected by the *Due Process Clause* is "the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[14] *Troxel v. Granville, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); see also Fields, 427 F.3d at 1204.* Among other things, this right means that

> the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely [*37] foreclosing the opportunity of individuals and groups to choose a different path of education.

*Id. at 1205* (quoting *Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 533-34 (1st Cir.1995), abrogated on other grounds by Martinez v. Cui, 608 F.3d 54 (1st Cir. 2010)).* This freedom, however, does not "encompass[] a fundamental constitutional right to dictate the curriculum at the public school to which [parents] have chosen to send their children." *Id.*

Parent Plaintiffs allege that the fundamental parental right to make decisions concerning the care, custody, and control of their children also encompasses the

---

[14] This right is commonly referred to as the *Meyer-Pierce* right because it finds its origin in two Supreme Court cases, *Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923),* and *Pierce v. Society of Sisters, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925).*

2020 U.S. App. LEXIS 4503, *37

following rights: (1) "the power to direct the education and upbringing of [their] children"; (2) the right to "instill moral standards and values in their children"; (3) the "right to determine whether and when their children will have to risk being exposed to opposite sex nudity at school"; and (4) the "right to determine whether their children, while at school, will have to risk exposing their own undressed or partially unclothed bodies to members of the opposite sex" in "intimate, vulnerable settings like restrooms, locker rooms and showers." Parent Plaintiffs claim that the District's implementation of the Student Safety Plan violates these rights, and therefore the *Fourteenth Amendment*, because Parent Plaintiffs **[*38]** "do not want their minor children to endure the risk of being exposed to the opposite sex . . . nor do they want their minor children to attend to their personal, private bodily needs in the presence of members of the opposite sex." They explain that they "desire to raise their children with a respect for traditional modesty, which requires that one not undress or use the restroom in the presence of the opposite sex," and that some parents also object to the Student Safety Plan because of "sincerely-held religious beliefs."

The district court disposed of this claim on the ground that the fundamental parental right protected by the *Fourteenth Amendment's Due Process Clause* is narrower than Plaintiffs assert. *See Parents for Privacy, 326 F. Supp. 3d at 1108-09*. The district court reasoned that although Parent Plaintiffs have the right to choose where their children obtain an education, meaning that they have a right to remove their children from Dallas High School if they disapprove of transgender student access to facilities, binding Ninth Circuit authority makes clear that "Parent Plaintiffs' *Fourteenth Amendment* liberty interest in the education and upbringing of their children 'does not extend beyond the threshold of the school door.'" *Id. at 1109* (quoting *Fields, 427 F.3d at 1207*).[15] The district court thus disagreed with **[*39]** Plaintiffs' unsupported proposition that parents "retain the right to prevent transgender students from sharing school facilities with their children." *Id.*

On appeal, Parent Plaintiffs argue that the district court erroneously limited their fundamental parental rights.

They challenge in particular the district court's conclusion that their parental rights do not "extend beyond the threshold of the school door." Plaintiffs, relying on *Troxel, 530 U.S. at 65-66* (quoting *Prince v. Massachusetts, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944))*, note that "the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." But other than affirming that parents have a long-recognized constitutional right to "make decisions concerning the care, custody, and control of their children," *Troxel* lends no concrete support to Plaintiffs' specific argument in this case. *Id. at 66*. *Troxel* concerned a state government's interference with a mother's decision about the amount of visitation with her daughters' paternal grandparents that was in her daughters' best interests; it did not address the extent of parents' rights to direct the policies of the public schools that their **[*40]** children attend.[16] *See id. at 67-73*. Moreover, we have previously explained that although the Supreme Court "recognized that parents' liberty interest in the custody, care, and nurture of their children resides 'first' in the parents, [it] does not reside there exclusively, nor is it 'beyond regulation [by the state] in the public interest.'" *Fields, 427 F.3d at 1204* (second alteration in original) (quoting *Prince, 321 U.S. at 166*).

Next, Plaintiffs attempt to distinguish *Fields*, the Ninth Circuit case on which the district court relied, by pointing out that the instant case is not about curriculum, but rather "about conduct authorized by the school allowing opposite-sex students into privacy facilities." *Fields* involved conduct authorized by the school allowing a researcher to administer a survey that included questions about sexual topics. *Fields, 427 F.3d at 1200-01*. We held that although "[p]arents have a right to

---

[15] Although it does not affect the application of *Fields* to this case or the merits of Plaintiffs' substantive argument, it is worth noting that we deleted the phrase "do[] not extend beyond the threshold of the school door" from the *Fields* opinion upon denial of rehearing. *See Fields, 427 F.3d at 1207*.

[16] Similarly, Plaintiffs' reliance on *Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)*, in their reply brief is unavailing. In that case, the Supreme Court held that the state of Wisconsin could not compel Amish parents to send their children to formal high school up to the age of 16, because as applied to the Amish parents in that case, doing so violated the *Free Exercise Clause of the First Amendment*, and also interfered with "the traditional interest of parents with respect to the religious upbringing of their children." *Id. at 214; see also id. at 232-36*. *Yoder* supports the district court's recognition that parents have the right to remove their children from Dallas High School, but it does not support Plaintiffs' assertion that their parental rights go beyond that decision and extend to a right to require a particular bathroom access policy for transgender students.

inform their children when and as they wish on the subject of sex," they "have no constitutional right . . . to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so." *Id. at 1206*. While the purported risk of Parent Plaintiffs' **[*41]** children being exposed to the unclothed bodies of students who were assigned the opposite sex at birth does not involve the provision of information, as did *Fields*, it similarly involves students being exposed to things of which their parents disapprove.

In any case, in *Fields* we adopted the Sixth Circuit's view that parents not only lack a constitutional right to direct the curriculum that is taught to their children, but that they also lack constitutionally protected rights to direct school administration more generally. *See id. at 1206* (rejecting a "curriculum exception"). Specifically, we endorsed the Sixth Circuit's explanation that:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities.

*Id.* (internal quotation **[*42]** marks omitted) (quoting *Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 395-96 (6th Cir. 2005)*). This binding precedent thus directly supports the district court's conclusion that Parent Plaintiffs lack a fundamental right to direct Dallas High School's bathroom and locker room policy.

Plaintiffs nonetheless argue that, contrary to *Fields*, the Supreme Court has extended parental rights into the classroom. Specifically, they argue that the Supreme Court has ruled that students from Jehovah's Witness families could not be compelled to recite the Pledge of Allegiance at school.[17] *See W. Va. State Bd. of Educ. v.*

*Barnette, 319 U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)*. But that Supreme Court decision rested on the *First Amendment*;[18] nowhere did the Supreme Court reference the fundamental rights of parents to direct their children's upbringing.[19] *See Barnette, 319 U.S. at 639, 642*. Thus, Plaintiffs fail to cite any Supreme Court authority showing that parents' substantive due process rights under the *Fourteenth Amendment* encompass a right to direct the curriculum, administration, or policies of public schools.

Finally, perhaps recognizing the lack of supporting case law, Plaintiffs argue that the following items both "undercut[] the district court's unprincipled expansion of *Fields*" and support the constitutional parental rights that Plaintiffs assert: **[*43]** (1) that "no one would seriously suggest [that] parents lack any means to assure their students are free from physical assault, coercive threats[,] or criminal activity"; (2) that "federal law and Oregon law confer on parents the right to inspect instructional materials upon request"; (3) that Congress in 2002 "enacted a federal law that no student can be required to take a survey concerning sexual behavior or attitudes unless the school provides parents with the survey before administering the survey to students and receives consent to administer the survey"; and (4) that "many states, including Oregon, have in place laws

---

[17] Plaintiffs cite *Minersville School District v. Gobitis, 310 U.S. 586, 60 S. Ct. 1010, 84 L. Ed. 1375*, for this proposition, but *Gobitis* actually held the opposite—namely, that the government could require students to salute the flag. The Supreme Court, however, overruled *Gobitis* three years later in *West Virginia State Board of Education v. Barnette, 319*

---

*U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)*. Thus, we assume that Plaintiffs actually intended to cite *Barnette*, particularly because their *Gobitis* pincite of "642" appears in *Barnette*, but not in *Gobitis*.

[18] Similarly, *Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)*, and *Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247, 5 L. Ed. 2d 231 (1960)*, both of which Plaintiffs cite in their reply, also rested on the *First Amendment* and its protection of students' and teachers' freedoms of speech and association.

[19] Moreover, unlike the instant case, *Barnette* involved "a compulsion of students to declare a belief." *Barnette, 319 U.S. at 631*. The Student Safety Plan does not compel a declaration of support for any particular belief. And in *Barnette*, the Court also noted that the appellees' asserted freedom not to salute the flag "does not bring them into collision with rights asserted by any other individual." *Id. at 630*. Here, in contrast, Plaintiffs' asserted right not to be exposed to any risk of seeing in a state of undress (or being seen by) any person who was assigned the opposite sex at birth does "bring them into collision with rights asserted by . . . other[s]," namely the rights of transgender students to use the locker rooms that match their gender identity and to avoid being subject to discrimination based on gender stereotypes regarding the sex assigned to them at birth. *See id.*

regulating public school education that require schools to allow parents to opt their children out of certain situations concerning sexual right [sic] and sex education." However, those assertions, even if true, do not establish that the *Fourteenth Amendment's Due Process Clause* protects the right asserted by Plaintiffs in this case. Although state and federal statutes may expand upon constitutional protections by creating new statutory rights, statutes do not alter the protections afforded by the Constitution itself.[20]

In sum, Plaintiffs fail to cite any authority that supports their asserted fundamental [*44] *Fourteenth Amendment* parental right to "determine whether and when their children will have to risk being exposed to opposite sex nudity at school" and "whether their children, while at school, will have to risk exposing their own undressed or partially unclothed bodies to members of the opposite sex" in "intimate, vulnerable settings like restrooms, locker rooms and showers." In fact, *Fields* makes clear that the fundamental right to control the upbringing of one's children does not extend so far as Plaintiffs' hypothesize. *See Fields, 427 F.3d at 1206-07*. Plaintiffs neither distinguish this precedent nor address the practical issue raised by *Fields*: that accommodating the different "personal, moral, or religious concerns of every parent" would be "impossible" for public schools, because different parents would often likely, as in this case, prefer opposite and contradictory outcomes. *Id. at 1206*. As a result, Plaintiffs' legal theory fails. Considering that Supreme Court and Ninth Circuit case law not only have not recognized the specific rights asserted by Plaintiffs, but further forecloses recognizing such rights as being encompassed by the fundamental parental rights protected by the *Fourteenth Amendment's Due Process Clause*, amendment of this claim would be futile.

For the foregoing [*45] reasons, we affirm the district

_____

[20] Plaintiffs provide no citation suggesting that the statutes they cite were enacted in order to enforce existing constitutional parental rights. Rather, the opposite inference—that the statutes were enacted to create rights specifically because the Constitution does not protect such rights—may be the more reasonable one. *Cf. Holt v. Hobbs, 574 U.S. 352, 135 S. Ct. 853, 859-60, 190 L. Ed. 2d 747 (2015)* ("Following our decision in *Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)*, Congress enacted [the Religious Freedom Restoration Act of 1993] in order to provide greater protection for religious exercise than is available under the *First Amendment*.").

court's dismissal with prejudice of this claim.

**D**.

Fourth, Plaintiffs contend that the district court erred in dismissing their claim for violation of their *First Amendment* free exercise rights.

The *First Amendment* provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." *U.S. Const., amend. I*. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 877, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)*, *superseded by statute in other contexts as stated in Holt, 135 S. Ct. at 859-60*. The Supreme Court has explained that the *First Amendment* "obviously excludes all 'governmental regulation of religious *beliefs* as such,'" meaning that "[t]he government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Id.* (citations omitted) (quoting *Sherbert v. Verner, 374 U.S. 398, 402, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963)*). The Supreme Court has also suggested that the government would interfere with the free exercise of religion impermissibly if it sought to ban the performance of or abstention from [*46] certain physical acts, but "only when [those acts] are engaged in for religious reasons, or only because of the religious belief that they display." *Id.* Nevertheless, the "freedom to act" pursuant to one's religious beliefs "cannot be" absolute; "[c]onduct remains subject to regulation for the protection of society." *Stormans, Inc. v. Selecky, 586 F.3d 1109, 1128 (9th Cir. 2009)* (citing *Cantwell v. Connecticut, 310 U.S. 296, 303-04, 60 S. Ct. 900, 84 L. Ed. 1213 (1940)*). Thus, "[t]he *Cantwell* right to freely exercise one's religion . . . 'does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes)."'" *Id. at 1127* (quoting *Smith, 494 U.S. at 879*).

Here, Plaintiffs claim that the Student Safety Plan violates their *First Amendment* rights to freely exercise their religion because the Student Safety Plan forces them to be exposed to an environment in school

bathrooms and locker facilities that conflicts with, and prevents them from fully practicing, their religious beliefs. Specifically, the complaint alleges that many Student Plaintiffs and some Parent Plaintiffs "have the sincere religious belief" that children "must not undress, or use the restroom, in the presence of a member of the opposite biological sex, **[\*47]** and also that they must not be in the presence of the opposite biological sex while the opposite biological sex is undressing or using the restroom." Because the Student Safety Plan permits transgender students who were assigned the opposite biological sex at birth into their locker rooms, the Plan "prevents Student Plaintiffs from practicing the modesty that their faith requires of them, and it further interferes with Parent Plaintiffs teaching their children traditional modesty and insisting that their children practice modesty, as their faith requires." Plaintiffs further assert that, as a result, "[c]omplying with the requirements of the Student Safety Plan . . . places a substantial burden on the Plaintiffs' exercise of religion by requiring Plaintiffs to choose between the benefit of a free public education and violating their religious beliefs."

The district court dismissed this claim on the basis that the Student Safety Plan was neutral and generally applicable with respect to religion, noting that "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the *Free Exercise Clause of the First Amendment*" because they need only be "rationally related to a legitimate government **[\*48]** interest." *Parents for Privacy, 326 F. Supp. 3d at 1110* (quoting *Holt, 135 S. Ct. at 859*) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993))*. The district court rejected Plaintiffs' assertion that, because the Plan pertains specifically to Student A, the Plan is not generally applicable. *Id.* The court, citing *Lukumi, 508 U.S. at 532-33*, explained that "Plaintiffs misunderstand the law," because neutrality and general applicability are "considered with respect to religion" rather than with respect to the person or groups to which the law most directly pertains. *Parents for Privacy, 326 F. Supp. 3d at 1110*. Because the District's Plan did not force any Plaintiff to embrace a religious belief and did not punish anyone for expressing their religious beliefs, the district court concluded that the Plan is "neutral and generally applicable with respect to religion," and therefore did not violate Plaintiffs' *First Amendment* rights. *Id.*

On appeal, Plaintiffs argue that the district court should have applied strict scrutiny because, contrary to the district court's conclusion, the Student Safety Plan is not

neutral or generally applicable. Plaintiffs point out that the Student Safety Plan was implemented to benefit one student in particular, and they claim, without any supporting citation, that "a policy implemented for a single student is not generally applicable." Plaintiffs do not **[\*49]** address the district court's reasoning that neutrality and general applicability are considered with respect to religion. Nor does their argument acknowledge that the Plan applies to all transgender students, not just to Student A; that is, the argument does not distinguish between an event that triggered development of a policy and the breadth of the resulting policy itself.

In assessing neutrality and general applicability, courts evaluate both "the text of the challenged law as well as the effect . . . in its real operation." *Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1076 (9th Cir. 2015)* (ellipsis in original) (internal quotation marks omitted). As the district court correctly explained, the two tests for whether a law is neutral and generally applicable focus on whether a law specifically targets or singles out religion. *See Parents for Privacy, 326 F. Supp. 3d at 1110; Lukumi, 508 U.S. at 532* ("[T]he protections of the *Free Exercise Clause* pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

First, "if the object of a law is to infringe upon or restrict practices *because of* their religious motivation, the law is not neutral." *Selecky, 586 F.3d at 1130* (emphasis added) (quoting *Lukumi, 508 U.S. at 533*). For example, "[a] law lacks facial neutrality if it refers to **[\*50]** a religious practice without a secular meaning discernable from the language or context." *Lukumi, 508 U.S. at 533*. Even if a law is facially neutral, it may nonetheless fail the neutrality test if "[t]he record . . . compels the conclusion that suppression of [a religion or religious practice] was the object of the ordinances." *Id. at 534, 542*. Thus, in *Lukumi*, the Supreme Court concluded that an animal ordinance that in its operation effectively banned only the ritual animal sacrifice performed by practitioners of the Santeria religion, was not neutral because it accomplished a "religious gerrymander," i.e., an impermissible attempt to target religious practices through careful legislative drafting. *See id. at 535-37*.

Here, on the other hand, Plaintiffs' complaint contains no allegation suggesting that the Student Safety Plan was adopted with the object of suppressing the exercise of religion. To the contrary, Plaintiffs allege that the District developed and implemented the Student Safety

Plan in "response to the threat of [federal] enforcement action" and in "response to Student A's complaints for accommodation." Moreover, the Student Safety Plan "make[s] no reference to any religious practice, conduct, belief, or motivation." *See [*51]* *Wiesman, 794 F.3d at 1076*. Instead, the Plan itself states that it was "created to support a transgender male expressing the right to access the boy's locker room at Dallas High School." Plaintiffs do not counter this evidence or point to anything in the record suggesting that the Student Safety Plan was adopted with the specific purpose of infringing on Plaintiffs' religious practices or suppressing Plaintiffs' religion. Accordingly, the district court correctly concluded that the Student Safety Plan is neutral for purposes of analyzing the free exercise claim.

Second, the question of general applicability addresses whether a law treats religious observers unequally. *See* *Lukumi, 508 U.S. at 542*. For example, "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id. at 542-43*. Thus, "[a] law is not generally applicable if its prohibitions substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." *Wiesman, 794 F.3d at 1079* (citing *Lukumi, 508 U.S. at 542-46*). "In other words, if a law pursues the government's interest 'only against conduct motivated by religious belief,' but fails to **[*52]** include in its prohibitions substantial, comparable secular conduct that would similarly threaten the government's interest, then the law is not generally applicable." *Id.* (quoting *Lukumi, 508 U.S. at 545*). For example, in *Lukumi*, the Court concluded that the challenged ordinances were not generally applicable because they "pursue[d] the city's governmental interests only against conduct motivated by religious belief" and "fail[ed] to prohibit nonreligious conduct that endanger[ed] these interests in a similar or greater degree than Santeria sacrifice does." *Lukumi, 508 U.S. at 543, 545*; *see also Selecky, 586 F.3d at 1134*.

Here, the Student Safety Plan is not underinclusive, because it does not require only religious students to share a locker room with a transgender student who was assigned the opposite sex at birth, nor does the Plan require only religious teachers and staff to receive training or to teach about anti-bullying and harassment. In other words, the Student Safety Plan affects all students and staff—it does not place demands on exclusively religious persons or conduct. Plaintiffs' singular argument that the Student Safety Plan is underinclusive because it was aimed at a particular student and does not allow every student to use the facilities **[*53]** of their choosing regardless of biological sex or self-identified gender misses the mark because it misunderstands the applicable test. Underinclusiveness is determined with respect to the burdens on religious and non-religious conduct and the interests sought to be advanced by the policy. That the Student Safety Plan focuses on transgender students rather than allowing all students to claim a right to use whichever facility they wish regardless of gender is irrelevant because that alleged underinclusion is not related to the interests furthered by the plan, and Plaintiffs have not tied it to burdens on secular versus religious conduct. The correct inquiry here is whether, in seeking to create a safe, non-discriminatory school environment for transgender students, the Student Safety Plan selectively imposes certain conditions or restrictions only on religious conduct. Because Plaintiffs have not made any showing that the Plan does so, the district court correctly determined that the Plan is generally applicable for purposes of the free exercise analysis. *See Parents for Privacy, 326 F. Supp. 3d at 1110*.

Because the Student Safety Plan qualifies as neutral and generally applicable, it is not subject to strict scrutiny. *See Selecky, 586 F.3d at 1129* ("[A] **[*54]** neutral law of general applicability will not be subject to strict scrutiny review."); *see also Smith, 494 U.S. at 888* ("Precisely because we are a cosmopolitan nation made up of people of almost every conceivable religious preference, and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming *presumptively invalid*, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order." (citation and internal quotation marks omitted)).

Plaintiffs argue that strict scrutiny should nevertheless apply because this suit concerns the alleged infringement of multiple constitutional rights. Relying on *Smith, 494 U.S. at 882*, they argue that "[w]here, as here, plaintiffs allege multiple fundamental rights arising under the *First* and *Fourteenth Amendments* (bodily privacy, parental rights and free exercise rights), hybrid rights analysis requires strict scrutiny as well." The district court rejected this argument because it had already dismissed Plaintiffs' other constitutional claims. *See Parents for Privacy, 326 F. Supp. 3d at 1110 n.10*. For the following reasons, we agree with the district court that Plaintiffs' argument—that strict scrutiny is required simply because Plaintiffs alleged multiple constitutional **[*55]** claims concerning fundamental

rights—fails here.

The extent to which the hybrid rights exception truly exists, and what standard applies to it, is unclear. In *Smith*, the Court noted that "[t]he only decisions in which we have held that the *First Amendment* bars application of a neutral, generally applicable law to religiously motivated action have involved not the *Free Exercise Clause* alone, but the *Free Exercise Clause* in conjunction with other constitutional protections." *Smith, 494 U.S. at 881*. However, *Smith* did "not present such a hybrid situation," and thus the Court did not further explain how a hybrid rights scenario should be scrutinized. *See id. at 882*. The Ninth Circuit subsequently discussed the nature of "hybrid rights" at length, and a three-judge panel majority concluded that, "[i]n order to trigger strict scrutiny, a hybrid-rights plaintiff must show a 'fair probability'—a 'likelihood'—of success on the merits of his companion claim." *Thomas v. Anchorage Equal Rights Comm'n, 165 F.3d 692, 706 (9th Cir.), reh'g granted, opinion withdrawn, 192 F.3d 1208 (9th Cir. 1999)*. The dissent, however, noted that "there is real doubt whether the hybrid-rights exception even exists" because "the Supreme Court itself has never explicitly held that it exists." *Id. at 722-23* (Hawkins, J., dissenting). "[T]he paragraph in *Smith* purporting to carve out a hybrid-rights exception is [*56] dicta," "the Supreme Court in *Smith* did not announce a different test for hybrid-rights cases," and "[e]ven the cases which the Supreme Court cited as involving 'hybrid rights' did not explicitly refer to or invoke strict scrutiny or a compelling government interest test." *Id. at 723-24*. In any case, that opinion discussing the appropriate hybrid rights test in our Circuit was withdrawn upon granting rehearing en banc, and the en banc court did not address the hybrid rights issue. *See Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1148 (9th Cir. 2000)* (en banc) (noting that "we postpone . . . application of [*Smith's*] newly developed hybrid rights doctrine") (O'Scannlain, J., concurring).

Moreover, *Miller v. Reed*, the Ninth Circuit case that Plaintiffs cite as the basis for the hybrid rights exception in our Circuit, was decided after the panel opinion in *Thomas* was issued, but before the three-judge panel opinion was withdrawn upon granting rehearing en banc. *See Miller v. Reed, 176 F.3d 1202 (9th Cir. 1999)*. Thus, no weight can be given to *Miller's* citation to the *Thomas* panel opinion for the suggestion that the hybrid rights exception has been established in our Circuit. *See id. at 1207* ("[W]e recently held that, to assert a hybrid-rights claim, 'a free exercise plaintiff must make out a "colorable claim" that a companion [*57] right has been

violated—that is, a "fair probability" or a "likelihood," but not a certitude, of success on the merits.'" (quoting *Thomas, 165 F.3d at 703, 707))*. There is therefore no binding Ninth Circuit authority deciding the issue of whether the hybrid rights exception exists and requires strict scrutiny.

Nonetheless, we need not resolve that question now, because even if a hybrid rights exception does exist, it would not apply in this case. For the reasons discussed in the *Thomas* panel opinion, alleging multiple failing constitutional claims that do not have a likelihood of success on the merits cannot be enough to invoke a hybrid rights exception and require strict scrutiny. *See Thomas, 165 F.3d at 703-07*; *cf. id. at 705* ("[A] plaintiff invoking *Smith's* hybrid exception must make out a 'colorable claim' that a companion right has been infringed."); *Miller, 176 F.3d at 1207-08* (collecting cases and noting that "[o]ther circuits have adopted . . . predicates for a hybrid-rights claim" that are "similar or more stringent" than the standard adopted in *Thomas*, and holding that "a plaintiff does not allege a hybrid-rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged [*58] fundamental right or a claim of an alleged violation of a non-fundamental or non-existent right"). As explained earlier in this opinion, Plaintiffs have not established colorable companion claims—they have not shown even a likelihood of success, which is why their claims were all dismissed with prejudice. Thus, even if the hybrid rights exception does exist, it would not apply to require strict scrutiny in this case. Alternatively, if the hybrid rights exception does not actually exist, then, of course, it cannot apply to this case to require strict scrutiny of Plaintiffs' purported hybrid claims. *Cf. Leebaert v. Harrington, 332 F.3d 134, 143 (2d Cir. 2003)* ("Several circuits have stated that *Smith* mandates stricter scrutiny for hybrid situations than for a free exercise claim standing alone, but, as far as we are able to tell, no circuit has yet actually applied strict scrutiny based on this theory."); *Catholic Charities of Sacramento, Inc. v. Superior Court, 32 Cal. 4th 527, 10 Cal. Rptr. 3d 283, 85 P.3d 67, 88 (Cal. 2004)* (explaining that a rule requiring only a "colorable" and not an "ultimately meritorious" companion claim would not make sense because it would allow the hybrid exception to swallow the *Smith* rule, and noting that the California Supreme Court was "aware of no decision in which a federal court has actually relied solely on the hybrid rights [*59] theory to justify applying strict scrutiny to a free exercise claim").

In sum, whether the hybrid rights exception exists and requires at least a colorable companion claim, or whether it does not really exist at all—an issue that we do not resolve here—Plaintiffs' argument that the hybrid rights exception requires that we apply strict scrutiny to their free exercise claim fails. Because strict scrutiny does not apply, we also need not address Plaintiffs' arguments about narrow tailoring.

Instead, we review the Plan for a rational basis, which means that the Plan must be upheld if it is rationally related to a legitimate governmental purpose. *See Wiesman, 794 F.3d at 1084*; *see also Selecky, 586 F.3d at 1127-28* ("Under the governing standard, 'a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'" (quoting *Lukumi, 508 U.S. at 531*)). "Plaintiffs 'have the burden to negate every conceivable basis which might support [the Plan].'" *Wiesman, 794 F.3d at 1084* (brackets omitted) (quoting *FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993))*. They fail to meet that burden, because they fail to negate what the record makes clear: the Student Safety Plan is rationally related to the legitimate purpose of **[*60]** protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status. *Cf. New York v. Ferber, 458 U.S. 747, 756-57, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)* (explaining that "a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling'" (quoting *Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982)))*; *Goehring v. Brophy, 94 F.3d 1294, 1300 (9th Cir. 1996)* (holding that a university had a compelling interest in the "health and well-being of its students").[21]

_____

[21] In their arguments regarding the compelling governmental interest that would be required if we were to apply strict scrutiny, Plaintiffs argue that "[t]he relevant government interest . . . cannot be a general interest in prohibiting discrimination because that position has already been rejected by the Supreme Court in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 573, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)*." But *Hurley* is inapposite because that was a free speech case; the Supreme Court's suggestion in *Hurley* that a broad statutory objective of forbidding discriminatory speech in public parades would be "fatal" because "[o]ur tradition of free speech commands that a speaker who takes to the street corner to express his views in this way should be free from interference by the State based on the content of what he says" is hardly surprising or

Plaintiffs' argument that the Supreme Court has also recognized bodily privacy as a compelling interest is unavailing, because it does not negate the fact that the Student Safety Plan has a rational basis. Thus, we conclude that because the Student Safety Plan is neutral, generally applicable, and rationally related to a legitimate governmental purpose, the Plan does not impermissibly burden Plaintiffs' *First Amendment* free exercise rights. *See Wiesman, 794 F.3d at 1085*. And because Plaintiffs have not shown that any new factual allegations could alter these conclusions based on settled precedent, amendment would be futile.

For the foregoing reasons, we affirm the dismissal with prejudice of Plaintiffs' *First Amendment* free exercise claim.

**V.**

Finally, Plaintiffs argue that the district court erred in failing to allow Plaintiffs leave to replead. Although **[*61]** Plaintiffs correctly point out that leave to amend should be liberally granted if the complaint can be saved by amendment, Plaintiffs have not shown, either in their briefing or at oral argument, how they could amend their complaint to remedy the many legal deficiencies in their claims. Instead, Plaintiffs simply argue that their complaint, as currently alleged, is sufficient to state their claims because their claims "were not conclusory; rather, they were extensive, well-articulated statements of fact that clearly pleaded claims for relief" and "exceeded both the *Twombly* and *Iqbal* standards."

_____

controversial. *See id. at 578-79*. That statement in *Hurley* certainly does not preclude the District here from asserting an interest in providing an accommodating and safe school environment for transgender students and assuring that they do not suffer the stigmatizing injury of discrimination by being denied access to multi-user bathrooms that match their gender identity. And in fact, the Supreme Court has recognized repeatedly that the government has a compelling interest "of the highest order" in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services." *Roberts v. U.S. Jaycees, 468 U.S. 609, 624, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)*; *see also id. at 623, 628* (noting that "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent," and holding that "Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms").

2020 U.S. App. LEXIS 4503, *61

The problem with Plaintiffs' complaint, however, is not the sufficiency of their factual allegations. Rather, as we have explained above, Plaintiffs' legal theories fail. Amending the complaint will not change, for example, the extent of the rights that are protected by the *Fourteenth Amendment's Due Process Clause*. As a result, we affirm the district court's denial of leave to amend.[22] Further amendment would simply be a futile exercise. *See V.V.V. & Sons Edible Oils. Ltd., 946 F.3d at 547*.


**VI**.

In summary, we hold that Dallas School District No. 2's carefully-crafted Student Safety Plan seeks to avoid discrimination and ensure the safety and well-being of transgender students; it does **[*62]** not violate Title IX or any of Plaintiffs' cognizable constitutional rights. A policy that allows transgender students to use school bathroom and locker facilities that match their self-identified gender in the same manner that cisgender students utilize those facilities does not infringe *Fourteenth Amendment* privacy or parental rights or *First Amendment* free exercise rights, nor does it create actionable sex harassment under Title IX.

Accordingly, Plaintiffs have failed to state a federal claim upon which relief can be granted. The judgment of the district court is

**AFFIRMED**.

---

*End of Document*

---

[22] Because we affirm the dismissal with prejudice of Plaintiffs' complaint, we do not reach the district court's determination that Plaintiffs' requested relief—a court order requiring transgender students to use single-user facilities or facilities that match their biological sex—would itself violate Title IX because it "would punish transgender students for their gender nonconformity and constitute a form of [impermissible] sex-stereotyping." *Parents for Privacy, 326 F. Supp. 3d at 1106* (citing *Whitaker ex rel. Whitaker, 858 F.3d at 1048-50*).