UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

EDWARD W. REYNOLDS, et al.,

                Plaintiffs,

v.

GREG TALBERG, et al.,

                Defendants,

WILLIAMSTON HIGH SCHOOL GAY-
STRAIGHT ALLIANCE,

                Intervenor-Defendant.
_____/

Case No. 1:18-cv-69

Honorable Hala Y. Jarbou

## <u>OPINION</u>

Plaintiffs are parents residing in the Williamston public school district in the State of Michigan.  Plaintiffs have sued on behalf of their school-age children against Defendants, members of the Williamston Community School District Board ("School Board").  Plaintiffs allege that seven policies ("Challenged Policies"), adopted or revised in the fall of 2017, violate Plaintiffs' freedom of religion and expression under the First Amendment of the U.S. Constitution, as well as the Fourteenth Amendment, several Articles of the Michigan Constitution, and various federal and state statutes.  The School Board moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs lacked standing, among other things.  (Defs.' Mot. To Dismiss, ECF No. 7.)  For the reasons set forth below, the court will grant Defendants' motion to dismiss.

# I. BACKGROUND

In the fall of 2017, the School Board adopted the Challenged Policies that are the subject of this lawsuit.  Taken together, the new and revised policies either clarify or newly prohibit discrimination against individuals on account of sexual orientation, gender identity, or gender expression.  For example, School Board Policy 7500 (Guidance Program) was revised to indicate that the "guidance and counseling services of the district shall be available to any student and shall not discriminate against any student on the basis of sex, race, age, color, national origin, religion, **sexual orientation, gender identity, gender expression**, or disability."  (Compl., ECF No. 1 Ex. B (emphasis added).)  School Board Policy 8720 was revised to indicate that student groups could not exclude students from meetings on account of, among other things, "sexual orientation, gender identity, [or] gender expression."  (Compl. Ex. G.)

Citing their Christian faith, Plaintiffs contend the Challenged Policies force their children to disregard their sincerely held religious beliefs and to "affirm[] . . . alternative sexual lifestyles" or else face punishment.  (*See* Compl. ¶¶ 1, 37, ECF No.1.)  The crux of Plaintiffs' claim is that the Challenged Policies "promote and force the approval of alternate sexual lifestyles and behavior" in a "manner that infringes upon Plaintiffs' personal identity, autonomy, and their sincerely held religious beliefs and convictions and constitutional right to oppose such policies and freely speak out on such issues in accordance with their sincerely held religious beliefs."  (*Id.* ¶¶ 28-29.)  Though Plaintiffs claim that the Challenged Policies permit Williamston public schools to punish students who refuse to "affirm[] . . . alternative sexual lifestyles" (*id.* ¶ 37), and would permit students to use bathroom and shower facilities in accordance with their gender identity (*id.* ¶ 41), the complaint does not allege that any student represented by Plaintiffs has been disciplined or otherwise restrained under the Challenged Policies, nor do they allege that any transgender

student has used facilities in accordance with their gender identity.  Plaintiffs do allege, however, that the Challenged Policies are vague and overbroad and impose a chilling effect on their children's freedom of speech and religion.  (*Id.* ¶¶ 132-39.)

Plaintiffs' complaint contains ten counts, six federal and five state claims (where Count III alleges both federal and state violations).  (Compl.)  Count I alleges that Defendants lacked legal authority to adopt the Challenged Policies.  (*Id.* ¶¶ 47-63.)  Count II alleges violation of a state statute governing school anti-bullying policies.  (*Id.* ¶¶ 64-68.)  Count III argues violations of state and federal constitutional rights to parenting because the Challenged Policies allegedly permit the school to keep a student's sexual orientation or gender identity a secret from their parents and force students to refrain from expressing their religious beliefs.  (*Id.* ¶¶ 69-79.)  Count IV alleges violations of Plaintiffs' federal constitutional rights to privacy, personal autonomy, and personal identity.  (*Id.* ¶¶ 80-91.)  Counts V-VI claim that the Challenged Policies unconstitutionally restrain Plaintiffs' First Amendment rights to free speech and exercise of religion.  (*Id.* ¶¶ 92-117.)  Count VII alleges that the Challenged Policies violate various provisions of the Michigan Constitution.  (*Id.* ¶¶ 118-22.)  Count VIII claims that the Challenged Policies violate Title IX, 20 U.S.C. § 1681 *et seq.*, by reducing students' athletic opportunities through permitting students to join teams that accord with their gender identity, thereby increasing competition to make it onto single-sex teams.  (*Id.* ¶¶ 123-31.)  Count IX alleges that the Challenged Policies are unconstitutionally vague because the terms "sexual orientation, gender identity, gender expression, transgender, harassment, aggressive behavior, and bullying" are insufficiently defined in the policies.  (*Id.* ¶¶ 132-39.)  Finally, Count X claims the Challenged Policies violate a state civil rights statute.  (*Id.* ¶¶ 140-145.)  Plaintiffs seek declaratory and injunctive relief, nominal damages, and attorney fees.  *Id.*

Two of the plaintiffs, Edward Reynolds and Erin Reynolds, pulled their two children out of public school in Williamston and enrolled them in private school in response to the School Board's adoption of the Challenged Policies.  The other plaintiff-parents, Monica Schaefer and Christopher Johnecheck, have kept their children enrolled in Williamston public schools.

The School Board disputes Plaintiffs' characterization of the Challenged Policies.  The Defendants contend that the Challenged Policies are not vague or overbroad, do not explicitly mandate gender-affirming use of facilities, and do not prevent students from expressing their sincerely held religious beliefs, much less impose any kind of affirmative duty to say anything that contradicts their religious beliefs.  The School Board argues that Plaintiffs appear to be suing over potential, hypothetical injuries; the School Board notes that Plaintiffs do not allege that the Challenged Policies have ever been used to discipline Plaintiffs' children.

## II. STANDARD

### A.  Justiciability

The U.S. Constitution limits the exercise of federal judicial power to live cases and controversies.  U.S. Const. Art. II § 2, cl. 1.  As a result, federal courts only have jurisdiction over cases that are considered justiciable.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A critical component of justiciability is standing.  *Id.*; *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

#### 1.  Standing

A plaintiff must have standing to sustain a lawsuit in federal court.  *Lujan*, 504 U.S. at 560. Standing has three elements: (1) injury in fact, (2) causation, and (3) redressability.  *Id.* at 560-61. Injury-in-fact has two distinct components; the plaintiff's alleged injury must be: (1) "concrete and

4

particularized," and (2) "actual or imminent, not conjectural or hypothetical."  *Id.* (internal

quotations omitted).  In essence, injury in fact exists where the plaintiff has suffered or will likely

suffer a real injury that is specific to the plaintiff, not a generalized grievance.  *Allen v. Wright*,

468 U.S. 737, 751 (1984).

With respect to prospective injuries to be inflicted by government enforcement, the

imminence component is satisfied where the plaintiff "alleges an intention to engage in a course

of conduct arguably affected with a constitutional interest, but proscribed by statute, and there

exists a credible threat of prosecution thereunder."  *Babbit v. Farm Workers*, 442 U.S. 289, 298

(1979); s*ee also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (For criminal

enforcement, "[a]n allegation of future injury may suffice if . . . there is a substantial risk that the

harm will occur" (internal quotations omitted)); *Clapper v. Amnesty Int'l USA* 568 U.S 398, 410

(2013) ("threatened injury must be certainly impending").

A plaintiff suing in federal court bears the burden of establishing standing.  *Lujan*, 504 U.S.

at 561.  When considering a motion to dismiss, courts must assume that the plaintiff's allegations

of fact are true.   At the pleading stage, the plaintiff has standing so long as their complaint

demonstrates that he suffered an injury to a cognizable interest that is traceable to the defendant's

conduct and redressable by court order.  *Id.*

### B.  Motion to Dismiss

When considering a motion to dismiss brought under Rule 12(b)(6), courts must ask

whether the plaintiff has alleged "facts that, if accepted as true, are sufficient to raise a right to

relief above the speculative level,' and . . .  'state a claim to relief that is plausible on its face.'"

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads

5

factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausible does not mean probable, but the standard "asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a plaintiff pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  On a motion to dismiss, courts must accept factual allegations as true, but will reject conclusory statements as "not entitled to the assumption of truth." *Id.* (citing *Twombly*, 550 U.S. at 555-56).  Hence, courts will ignore conclusory assertions and, accepting well-pleaded factual allegations as true, determine whether the allegations "plausibly give rise to an entitlement to relief."  *Id.*  Determining the plausibility of a claim is a "context-specific" inquiry, "requiring the reviewing court to draw on its experience and common sense." *Id.*  If the court decides that there is no plausible claim to relief, then the motion to dismiss will be granted.

### III. ANALYSIS

#### A.  Federal Claims

The court will first take up Plaintiffs' various federal claims (Counts III-VI, VIII-IX) before addressing the state claims (Counts III, VII, X).  Plaintiffs lack standing with respect to Counts III-VI and VIII because they have not alleged any actual injury.  Count IX fails because the Challenged Policies are not unconstitutionally vague.

##### 1.  Counts III-IV

Plaintiffs allege various issues with the Challenged Policies, though not every Challenged Policy is discussed in the federal claims.  Each federal claim references multiple Challenged Policies.  The Challenged Policies that form the bases of Counts III-IV are School Board Policies

7500, 8010, 8011, 8260-R, and 8270, though not each of the foregoing policies are mentioned in each claim.  However, at least with respect to their federal claims, Plaintiffs have not alleged injury in fact with respect to any Challenged Policy sufficient to confer standing.  Therefore, in dismissing Counts III-IV for lack of standing, the Court will focus its analysis on Plaintiffs' contentions regarding the Challenged Policies themselves, rather than the specific causes of actions used to attack the policies.

Plaintiffs lack standing because they have not suffered an "actual" injury, nor is any injury "imminent."  *Lujan*, 504 U.S. at 560-61.  The Challenged Policies have never been applied to Plaintiffs in the ways that Plaintiffs allege the policies will be applied.  Hence, as a pre-enforcement challenge, Plaintiffs must demonstrate that there is a substantial risk that the Challenged Policies will be enforced against students in the way Plaintiffs foresee.  *Driehaus*, 573 U.S. at 158. Yet Plaintiffs do not specify exactly what kind of conduct they would like to engage in that would be prohibited by the Challenged Policies, nor has any school official threatened enforcement of any kind against Plaintiffs.

Plaintiffs allege that they do not "oppose or demean any person for who they truly are as a person." (Compl. ¶ 14.)  They also "sincerely believe that they have a duty and obligation to live out their faith in all areas of life, including defending their faith in public."  (Compl. ¶ 18.)  Plaintiffs imply that defending their faith extends to opposing the Challenged Policies; they fear that such opposition will be characterized as "bullying and hate speech" and accordingly punished under the Challenged Policies.  (Compl. ¶ 30.)  School Board Policy 8260-R, which governs bullying and other harassing behavior, does not mention hate speech but does define "verbal bullying" as "taunting, malicious teasing, insulting, name calling, [or] making threats." (Compl. Ex. F.)  Plaintiffs do not specify what they plan to say in defense of their faith, much less how

those statements will violate Defendants' policy against bullying.  Such vague allegations do not establish imminent injury.  *Babbit*, 442 U.S. at 298; *see also Glenn v. Holder*, 690 F.3d 417, 420 (6th Cir. 2012) (no imminent injury where "[p]laintiffs can't quite pinpoint what it is they want to say that could subject them to prosecution under the [statute]").

Similarly, School Board Policy 8720, another Challenged Policy, prohibits "student initiated, non-curricular related" school groups from barring *attendance* to their meetings based on a student's sexual orientation or gender identity, among other criteria.  (Compl. Ex. G.) Plaintiffs do not allege how they intend to violate this policy, nor that Defendants have threatened enforcement of the policy against Plaintiffs.  Their allegations fail to establish standing under *Babbit*.

The alleged injury is even more attenuated for other Challenged Policies.  School Board Policy 7500 states, in relevant part, that "[t]he guidance and counseling services of the district *shall be available* to any student *and shall not discriminate* against any student on the basis of sex, race, age, color, national origin, religion, sexual orientation, gender identity, gender expression, or disability."  (Compl. Ex. B (emphasis added).)  Plaintiffs allege that Policy 7500 "requires the School District to *only* provide counseling services that *approve and promote* alternative sexual lifestyles, thereby violating the parents' constitutional right to control and direct the upbringing and education of their children." (Compl. ¶ 75 (emphasis added).)  They do not allege that students must submit to counseling or how, exactly, counselors who are not permitted to discriminate on various dimensions will "promote alternative sexual lifestyles."

Plaintiffs infer additional requirements on Williamston public schools through School Board Policy 8010.  Policy 8010 relates to equal educational opportunity and compliance with

Title IX of the Education Amendments, Pub. L. No. 92-318, 86 Stat. 235 (June 23, 1972).  (Compl. Ex. C.)  In relevant part, the policy states that:

> Every child, regardless of . . . sexual orientation, gender identity, [or] gender expression . . . is entitled to equal opportunity for educational development.
>
> No student will be excluded from participating in, denied the benefits of, or subjected to discrimination under any educational program or activity conducted by the district. [Defendants] shall treat its students without discrimination as this pertains to course offerings, athletics, counseling, employment assistance, and extracurricular activities.
>
> No district employee or student enrolled in the district, on the basis of sex, shall be excluded from participation in, be denied the benefits or, or be subjected to discrimination under any educational program or activity receiving federal financial assistance.

(Compl. Ex. C.)

Plaintiffs allege that this policy "requires the School District to allow students to participate in athletics, extracurricular activities and other educational programs of the opposite sex" in violation of both "parents' constitutional right to control and direct the upbringing and education of their children" and "parents' and students' constitutional right to privacy, personal identity, and personal autonomy."  (Compl. ¶¶ 74, 86.)  Yet again, there are no allegations that any sort of violative "participat[ion]" has actually happened, nor are there allegations regarding what, specifically, Williamston public schools will do under Policy 8010 or how those impending acts will violate Plaintiffs' rights.  The vagueness of these allegations reveal the hypothetical nature of Plaintiffs' claimed injuries and serve no basis for standing.  *Lujan*, 504 U.S. at 560-61.

School Board Policy 8011 promises that Williamston public schools "shall accept the gender identity" of a student as asserted by that student or the student's parents/legal guardians.  (Compl. Ex. D.)  The policy also states that "parental and family support are key determinants of transgender and nonconforming student health; therefore . . . . School officials must consider the

health, safety, and well-being of the student, as well as the responsibility to keep parents informed." (Compl. Ex. D.)  Plaintiffs contend that Policy 8011 "allows the School District to refuse to notify a parent of the assertion of any gender or sexual orientation choice purportedly made by their child at school, thereby violating the parent's right to personal identity and personal autonomy." (Compl. ¶ 84.)  Yet Defendants expressly disclaim the power to refuse to inform parents of their child's asserted gender identity or sexual orientation.  (Def.'s Mot. to Dismiss at 16-17.)

It is true that, in some cases, plaintiffs have been found to have standing in a pre-enforcement challenge even where the defendant disavows the power to enforce.  Plaintiffs point to *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390 (6th Cir. 1987), to argue that they have standing despite Defendants' disclaimer.  In *Planned Parenthood Ass'n of Cincinnati*¸ the plaintiff, an abortion provider, had standing to bring a pre-enforcement challenge despite the defendant's claim that the law in question could not be enforced against the plaintiff.  *Id.* at 1394-95.  The court found standing because the statute "clearly contemplate[d] that facilities such as the one operated by [plaintiff] would be subject to application of the statute." *Id.*  However, the circumstances here do not warrant a finding of standing.  Plaintiffs are not "subject to the application of the statute."  Williamston schools are.  Policy 8011 does not require Plaintiffs to accept anyone's asserted gender identity or to do anything with such information.  Rather, the policy imposes obligations on Williamston public schools.  Because Plaintiffs are not subject to the application of Policy 8011, *Planned Parenthood Ass'n of Cincinnati* is inapposite, and they cannot ascribe enforcement power to Defendants that Defendants themselves disclaim. Plaintiffs do not have standing to sue over Policy 8011.

Plaintiffs further contend that Policy 8011 "requires the School District to allow students and other individuals to use the showers, locker rooms, bathrooms and other facilities of the opposite sex." (Compl. ¶ 85.) This is by far their most specific allegation. It is insufficient all the same. Setting aside whether Plaintiffs' rights would be violated *if* the school permitted transgender students to use facilities in accordance with their gender identity, Plaintiffs have failed to provide sufficiently specific allegations to satisfy the imminence requirement of injury in fact. On this point, Defendants cite to *Students & Parents for Privacy v. U.S. Dep't of Ed., et. al.*, 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017), which the Court finds persuasive. The plaintiffs in *Students & Parents for Privacy* brought various claims, some of which related to a transgender student's ("Student A") permission to use school facilities in accordance with her gender identity. *Id.* at *1. However, Student A graduated over the course of the litigation. *Id.* at *2. The court thus determined that the plaintiffs' claim was no longer live. *Id.* at *3. It did not matter to the court that a second transgender student, Student B, was contemplating availing himself of the challenged school policy so that he could use facilities consistent with his gender identity: "[t]he fact that other transgender students want or might want to use sex-segregated facilities consistent with their gender identity, however, neither suggests that the injury of which [p]laintiffs complained is continuing or that the injury complained of will be repeated." *Id.*

That logic is applicable here. If a real student actively contemplating invoking a school policy to use facilities in accordance with their gender identity was insufficient to make out a justiciable claim, then a *hypothetical* student invoking a policy that *hypothetically* permits them to use facilities consistent with their gender identity cannot be a sufficiently concrete and imminent harm to confer standing. Plaintiffs have not made allegations sufficient to sue over Policy 8011.

Counts III and IV fail because Plaintiffs have not suffered any injury in fact from Challenged Policies 7500, 8010, 8011, 8260-R, or 8270.

### 2.  Counts V-VI

Counts V and VI (claiming that the Challenged Policies violate Plaintiffs' First Amendment rights to free speech and free exercise of religion) argue that the Challenged Policies impose a chilling effect on the exercise of free speech and religion.  (Compl. ¶¶ 99, 116.)  It is unclear whether Plaintiffs are arguing that the Challenged Policies are overbroad, and thus facially invalid, or that the Challenged Policies cannot be constitutionally applied to Plaintiffs themselves. In either case, Plaintiffs lack standing.

A plaintiff may bring suit alleging that school policies "chill" their First Amendment rights, i.e. that the policies impermissibly dissuade the plaintiff from engaging in protected speech or religious expression for fear of reprisal under the school's policies.  *See, e.g.*, *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (plaintiff organization had standing to sue school alleging vague anti-bias policies and apparatus for enforcing those policies chilled students' free speech rights); *Virginia v. Hicks*, 539 U.S. 113 (2013).  Courts have distinguished between two types of chilling effect claims: "subjective" and "objective" chills.  *Id.*  "[T]he term 'objective chill' . . . refer[s] to laws or regulations that produce direct injuries [while] the term 'subjective chill'" refers to laws or regulation that do not produce injuries.  *Id.*  Hence, claims of objective chill are actionable, whereas claims for subjective chill are not.  *See Morrison v. Bd. of Ed. of Boyd Cnty.* (*Morrison II*), 521 F.3d 602, 610 (6th Cir. 2016) (plaintiff lacked standing to challenge school's anti-bullying policies because he only experienced subjective chill).

Federal courts recognize two distinct types of chilling effect challenges: (1) as-applied, where the plaintiff claims that an otherwise constitutional statute cannot be constitutionally applied

against him, and (2) facial overbreadth, where the plaintiff asserts that application of the statute would be unconstitutional in such an overwhelming number of cases that the law is facially invalid. *Speech First*, 939 F.3d at 764.  Overbreadth claims permit the plaintiff to stand in for parties not before the court, and a successful overbreadth claim can be made even where the plaintiff's own conduct would not be protected by the First Amendment, so long as the statute is shown to "substantially abridge[] the First Amendment rights of other parties not before the court."  *Vill. of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980). Nevertheless, a statute's overbreadth is not an injury in and of itself; "[e]ven where a litigant challenges a law or regulation as overbroad, that litigant must still 'show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.'"  *Speech First*, 939 F.3d at 764 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)) (internal quotations omitted).  An overbreadth claim does not relieve the plaintiff of the burden of proving that he has personally suffered an actual or imminent injury sufficient to confer standing.  *Id.*

The distinction between an overbreadth challenge and an as-applied challenge can have consequences for standing.  *See Speech First*, 939 F.3d at 676 (finding plaintiffs had stronger case for standing because they brought a facial challenged compared to plaintiff in *Morrison II* who brought an as-applied challenge).  However, those differences are irrelevant here.  Plaintiffs lack standing to sue over the Challenged Policies regardless of whether their claims are brought as an as-applied or facial challenge because they have failed to allege an imminent injury.

Plaintiffs' complaint frequently claims that the Challenged Policies not only restrict free speech and religious exercise by demanding *silence* from those students whose faith requires strict adherence to gender norms, but also that the policies *compel* students to actively *affirm* sexual orientations and gender expressions they find sinful.  (*See, e.g.*, Compl. ¶¶  30-32, 76, 97-99.)

13

They argue that the Challenged Policies require schools "to punish students for . . . merely expressing opposition to [Defendants'] approved alternative sexual lifestyles, or for acting with purported 'aggressive behavior' against other students with whom they simply disagree."  (*Id.* ¶ 76.)

Yet Plaintiffs' complaint is bereft of allegations that any student, either one of their own children or any other, has ever been punished or threatened with punishment under the Challenged Policies for expressing dissent or disapproval of another student's sexual orientation, gender identity, or gender expression.  Nor do the allegations specify what Plaintiffs intend to do or say, beyond vague intentions to "defend[] their faith" (Compl. ¶ 18), that would violate the Challenged Policies.  Such generalized assertions are insufficient.  *See Glenn*, 690 F.3d at 420 (no imminent injury where "[p]laintiffs can't quite pinpoint what it is they want to say that could subject them to prosecution under the [statute]").  Plaintiffs have failed to establish an imminent injury under the standard set forth in *Babbit* because they have not alleged what they specifically intend to say or do that would subject them to enforcement  under the Challenged Policies.

This is not a situation where Plaintiffs' desired expressions would be unprotected but may nevertheless stand in for parties whose protected speech would be infringed by the Challenged Policies.  Plaintiffs have not suffered an injury at all.  Nor, as described above, is any injury imminent.  Chill "typically constitutes the 'reason why the governmental imposition is invalid rather than . . . the harm which entitles [a party] to challenge it.'"  *Morrison II*, 521 F.3d at 609-10 (quoting *Adult Video Ass'n v. U.S. Dep't of Just.* 71 F.3d 563, 566 (6th Cir. 1995)).

This case is distinguishable from *Speech First*, where the plaintiff established an injury in fact, and more like *Morrison II*, where the plaintiff could not.  In *Speech First*, a facial overbreadth challenge, the court found that the plaintiffs faced imminent injury because of the school's

14

apparatus for enforcing vague anti-bias harassment and bullying policies. *Id.* at 764-65. There, the defendant school established a "Bias Response Team" that could refer students for investigation and possible discipline based on student-submitted reports of policy violations, though the Team did not have any disciplinary powers of its own. *Id.* at 765. The Bias Response Team could make a referral even if the complaining student did not want any further action taken in relation to their complaint, as well as invite the allegedly transgressing student to meet. *Id.* The court in *Speech First* held that this apparatus amounted to an imminent injury for the plaintiffs. *Id.* The threat of referral – even if the following investigation did not result in punishment – based on potentially threadbare claims of violations of vague policies proved a substantial enough threat that plaintiffs may feel compelled to meet with the Bias Response Team, or even refrain from speaking their minds at all. *Id.* The machinery and processes built by the defendant school to implement their unconstitutionally vague policies constituted an objective chill, thus satisfying the injury in fact requirement for standing.

In the present case, Plaintiffs have not specified any intended course of action that would arguably subject them to enforcement under the Challenged Policies, nor have they alleged anything approaching the enforcement apparatus described in *Speech First*. There is no special team or task force whose sole purpose is to process allegations of bullying or harassing speech. School Board Policy 8260-R instructs students to report instances of bullying to their school's principal or vice-principal, who surely carry a portfolio of responsibilities beyond initiating investigations into potential student misconduct. (Compl. Ex. F.)

Furthermore, Defendants' policy offers much clearer definitions of the terms "bullying" and "harassment" compared to the definitions used by the university for the same terms in *Speech First*. School Board Policy 8260-R states that bullying

15

is defined as in a classroom, elsewhere on school premises, on a school bus or other school related vehicle, or at a school-sponsored activity or event whether or not it is held on school premises. It also includes conduct using a telecommunications access device or telecommunications service provider that occurs off school premises if either [is] owned by or under the control of the District.

   1. Substantially interfering with educational opportunities, benefits, or programs of one (1) or more students;

   2. Adversely affecting the ability of a student to participate in or benefit from the school District's educational programs or activities by placing the student in reasonable fear of physical harm or by causing substantial emotional distress;

   3. Having an actual and substantial detrimental effect on a student's physical or mental health; and/or

   4. Causing substantial disruption in, or substantial interference with, the orderly operation of the school.

Bullying can be physical, verbal, psychological, or a combination of all three. Some examples of bullying are:

   1. <u>Physical</u> - hitting, kicking, spitting, pushing, pulling; taking and/or damaging personal belongings or extorting money, blocking or impeding student movement, unwelcome physical contact.

   2. <u>Verbal</u> - taunting, malicious teasing, insulting, name calling, making threats.

   3. <u>Psychological</u> - spreading rumors, manipulating social relationships, coercion, or engaging in social exclusion/shunning, extortion, or intimidation. This may occur in a number of different ways, including but not limited to notes, emails, social media postings, and graffiti."

(Compl. Ex. F.)

The Policy also states that

harassment includes, but is not limited to, any act which subjects an individual or group to unwanted, abusive behavior of a nonverbal, verbal, written or physical nature, often on the basis of age, race, religion, color, national origin, marital status or disability, but may also include sexual orientation, gender identity, gender expression, physical characteristics (e.g., height, weight, complexion), cultural background, socioeconomic status, or geographic location (e.g., from rival school, different state, rural area, city, etc.).

(Compl. Ex. F.)

The challenged definitions in *Speech First* came from the Merriam-Webster dictionary, defining "harassing" as "(1) to annoy persistently (2) to create an unpleasant or hostile situation for, especially by uninvited and unwelcome verbal and physical conduct," while bullying was

defined as "(1) to frighten, hurt, or threaten (a smaller weaker person), (2) to act like a bully toward (someone), (3) to cause (someone) to do something by making threats or insults or by using force, (4) to treat abusively, (5) to affect by means of force or coercion." *Speech First*, 939 F.3d at 762. Defendants' definitions are much more clear and extensive than those employed in *Speech First*.

This case more closely resembles *Morrison II*. The plaintiff in *Morrison II* was a Christian student who "believe[d] that homosexuality [was] a sin" and that "part of his responsibility as a Christian [was] to tell others when their conduct does not comport with his understanding of Christian morality." *Morrison II*, 521 F.3d at 605. He brought a pre-enforcement action against his school for policies that prohibited students from "making stigmatizing or insulting comments regarding another student's sexual orientation." *Id.* Out of fear of punishment under the new policies, the plaintiff refrained from expressing his beliefs regarding Christian moral views on sexual orientation. *Id.* The plaintiff claimed that the school's policies imposed an unconstitutional chilling effect on his right to free speech. *Id.* The court in *Morrison* held that plaintiff's as-applied challenge related to a subjective chilling effect, which meant that the plaintiff could not allege a potential injury sufficient to confer standing. *Id.* at 610. The plaintiff had not alleged that the school had made any concrete plans or threats to enforce the policy against him, and as such, his new reluctance to inform others about their immorality did not rise to the level of an imminent injury. *Id.* at 610.

Like in *Morrison*, Plaintiffs here fail to allege any credible threat of enforcement of the Challenged Policies, and thus their perception of chill is subjective and unactionable. As in *Morrison*, and unlike *Speech First*, the School Board has not established any kind of apparatus for enforcing the Challenged Policies that would threaten Plaintiffs with a real and imminent injury sufficient to confer standing.

As a final matter, Plaintiffs allege in Count VI that the Challenged Policies violate the rights of religious students by permitting students to use bathroom facilities and participate on school sports teams that conform with their gender identity.  (*Id.* ¶¶ 112, 128.)  However, they do not allege that any transgender student has attempted to use facilities or join a sports team that conforms to their gender identity. As discussed earlier, imminent harm is not established where Plaintiffs merely allege that a hypothetical transgender student might attempt to use facilities or join sports teams consistent with their gender identity, to the extent such accommodations constitute a harm at all.  *See Students & Parents for Privacy*, WL 6629520 at *3.  Because Plaintiffs cannot allege an injury in fact, they cannot sustain claims that the Challenged Policies objectively chill the exercise of their First Amendment rights.

### 3. Count VIII

Plaintiffs' Title IX claim (Count VIII) fails for lack of an actual or imminent injury.  The complaint states that Plaintiffs' female children have suffered a loss of opportunity under School Board Policy 8011, which Plaintiffs claim requires the school to permit students to seek admission to single-sex sports teams based on their gender identity, i.e. Plaintiffs' children face increased competition to get on all-girls teams because students whom the Plaintiffs view as male will also be permitted to try out for the all-girls teams based on their female gender identity.  Yet Policy 8011 does not explicitly call for such accommodations and Plaintiffs do not allege that any transgender student has actually attempted – much less been permitted – to join a sports team that conforms with their gender identity.  Actions brought under Title IX require an actual injury.  *See Davis v. Monroe Co. Bd. of Ed.*, 526 U.S. 629, 650 (1999).  None is alleged here.

4.  <u>Count IX</u>

Plaintiffs' final federal claim is that the Challenged Policies are unconstitutionally vague. (Compl. ¶¶ 132-39.)  Specifically, Plaintiffs assert that the terms "'sexual orientation,' 'gender identity,' 'gender expression,' 'transgender,' 'harassment,' 'aggressive behavior,' and 'bullying' are not clearly defined and do not protect the constitutional rights of parents and students." (*Id.* ¶ 137.  All of the challenged terms are sufficiently definite and, thus, Plaintiffs' claim fails.

When the commands of a law are so vague as to be indiscernible to a person of "ordinary intelligence," the law is void under due process.  *Hill v. Colorado*, 530 U.S. 730, 732 (2000) (Laws must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.").  But the constitutional concept of vagueness goes beyond ordinary ambiguity: "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  A plaintiff must clear a high hurdle to bring a successful void-for-vagueness claim.  Courts may only strike down a law for vagueness when "the enactment is impermissibly vague in all of its applications."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).

As discussed above, the School Board's definitions of misconduct like "bullying," "harassment," and "aggressive behavior" are clear and extensive.  The definitions are far more detailed than those at issue in *Speech First*, 939 F.3d at 762.  In fact, the School Board's definitions of misconduct resemble revised policies that have previously been found constitutional.[1] *Morrison*

---

[1] The District Court in *Morrison I* held that "[i]n their current form, the written policies are [constitutional]." *Morrison I*, 419 F. Supp. 2d at 942. The revised policies stated that "anti-homosexual speech would not be prohibited unless it was 'sufficiently severe or pervasive that it adversely affects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed . . . . The civil exchange of opinions or debate does not constitute harassment. Students may not, however, engage in behavior that interferes with the rights of another student or materially and substantially disrupts the educational process.'" *Morrison II*, 521 F.3d at 607. The Challenged Policies adopt similar standards. (*See* Compl. Ex. F.)

*ex rel. Morrison v. Bd. of Educ. of Boyd Cnty.* (*Morrison I*), 419 F. Supp. 2d 937, 942 (E.D. Ky. 2006), *rev'd on other grounds*, 939 F.3d 602 (6th Cir. 2008). Phrases like "sexual orientation" and "gender identity" have also been held sufficiently definite to foreclose vagueness challenges. *See Hyman v. City of Louisville*, 132 F. Supp. 2d 528, 545-47 (W.D. Ky. 2001), *vacated on other grounds*, 53 F. App'x 740 (6th Cir. 2002) (finding plaintiff lacked standing to sue at all). If the phrase "gender identity" is not too vague, then surely companion concepts like "transgender" and "gender expression" are not overly vague either. None of these definitions is "impermissibly vague in all of its applications." *Vill. of Hoffman Estates*, 455 U.S. at 494-95. Plaintiffs' void-for-vagueness challenge fails.

### 5.  Transfer of Reynolds Children Not an Injury

As a final matter, the Reynolds' decision to transfer their children from Williamston public schools to private schools in response to the Challenged Policies does not constitute an injury in fact. (*See* Compl. ¶ 9.) As described above, as a matter of law, Plaintiffs do not allege any imminent injury. The Reynolds' transfer of their children in anticipation of the Challenged Policies' enforcement cannot amount to an injury in fact where the Challenged Policies themselves do not pose a threat sufficient to qualify as an imminent injury. In short, Plaintiffs cannot create an injury out of a non-injury. *See Clapper*, 568 U.S. at 416 ("respondents cannot manufacture standing by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). The transfer of the Reynolds children cannot serve as a basis for standing.

### B.  State Claims

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 551 U.S. 375, 377 (1994). By statute, federal district courts are granted original jurisdiction

over all "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Except in narrow instances, federal courts lack jurisdiction to adjudicate claims based in state law.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966).  Diversity jurisdiction grants federal courts authority to hear state claims so long as each plaintiff resides in a different state from each defendant and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  Federal courts may also exercise supplemental jurisdiction over state claims where the court has original jurisdiction with respect to some claims and the state claims "are so related to claims in the action within . . . original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).

Where, as here, adjudication of a motion to dismiss leaves the plaintiff without any federal causes of action, courts should not exercise supplemental jurisdiction over the state claims.  *See Gibbs*, 383 U.S. at 726 ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").  Because this Court will dismiss all of Plaintiffs' federal law claims, it will not exercise jurisdiction over any of Plaintiffs' state law claims.  Therefore, the state law claims will be dismissed.

## IV. CONCLUSION

For the reasons stated, Defendants' motion to dismiss (ECF No. 7) will be granted.  Counts III-VI and VIII will be dismissed for lack of jurisdiction.  Count IX will be dismissed for failure to state a claim upon which relief can be granted.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  Because the Court will grant Defendants' motion to dismiss, Defendant-Intervenor's motion to dismiss (ECF No. 11) will be denied as moot.  The motion to file an amicus brief in support of Defendants and Defendant-Intervenor (ECF No. 30) by the Michigan Attorney General will also be denied as moot.  An order and judgment will enter in accordance with this Opinion.


Dated:   October 30, 2020                              /s/ Hala Y. Jarbou
                                                       Hala Y. Jarbou
                                                       United States District Judge